[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-14662

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 20, 2006
THOMAS K. KAHN
CLERK

BIA Nos. A74-661-613 & A74-661-614

DIEGO F. CASTILLO-ARIAS,
MARTHA L. RINCON-ESCOBAR,
ANDRES F. CASTILLO-RINCON,
DIEGO F. CASTILLO-RINCON,

                                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 20, 2006)**

Before BIRCH and MARCUS, Circuit Judges, and NANGLE[*], District Judge.

BIRCH, Circuit Judge:

_____

[*]Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

Previously, we remanded this case to the Board of Immigration Appeals ("BIA") to determine whether noncriminal informants working against the Cali drug cartel constitute a "particular social group" within the meaning of that phrase in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq. The BIA concluded they did not. In this appeal, applying deferential review, we ask whether the BIA's interpretation of this statutory provision is reasonable. Concluding that it is, we DENY, with consternation, the petition for review of the BIA's order dismissing the appeal of Diego F. Castillo-Arias, Martha L. Rincon-Escobar, Andres F. Castillo-Rincon, and Diego F. Castillo-Rincon (collectively "Castillos") from the immigration judge's ("IJ's") order denying their application seeking asylum and withholding of deportation.

## I. BACKGROUND

We incorporate the following facts and procedural history, which are not in dispute, from our previous decision in this case:

> Diego Castillo-Arias ("Castillo-Arias") was born and raised in Cali, Colombia, the headquarters of the infamous Cali drug cartel.[1] Joined by his wife, Martha Rincon-Escobar, and his two sons, Andres Castillo-Rincon and Diego Castillo-Rincon, Castillo-Arias operated a bakery in Cali and resided in the city until 1996. During that time,

---

[1] Our recitation of the facts is drawn from Castillo-Arias's testimony before the Immigration Judge. The court found Castillo-Arias to be a credible witness. On appeal, the Government does not challenge Castillo-Arias's credibility or his account of the facts. Therefore, the facts are undisputed.

2

Castillo-Arias was an acquaintance of Arturo Davila, a former policeman in the Cali Police Department who, after being fired for corruption, became the chief of security for the Cali cartel. Castillo-Arias also happened to be a good friend of Vladimir Martinez Meza, who was responsible for investigating and prosecuting narcotics traffickers in Cali.

Between 1990 and 1994, Davila would visit Castillo-Arias's bakery on the weekends and chat openly and brazenly about his involvement with the Cali cartel. During these conversations, Davila would identify people, places and events related to the cartel's exportation of narcotics from Colombia to the United States and Europe. Castillo-Arias, as a civic-minded citizen of Cali, passed the information he learned from Davila along to Meza. He told Meza about Davila's statements that the cartel had declared war against the Colombian government and that the cartel would kill politicians who oppose it. Castillo-Arias also disclosed the extent, location and size of the assets of the Cali cartel, including banks, bank accounts, mansions, haciendas, and villas both within and outside Colombia.

Castillo-Arias's good deeds would not go unpunished. On May 15, 1995, as Castillo-Arias was watching his son Andres ride his bicycle in the street, a car suddenly blocked their path and three men emerged armed with pistols and an automatic weapon. The men tried to force Castillo-Arias into the car, but he resisted and was pushed to the ground and beaten. His beating caused Andres to scream loudly, and one of the men pistol-whipped Andres in the face. Andres's scream and the accompanying commotion prompted people in the neighborhood to emerge from their homes, and the men fled in their car. As they departed, they told Castillo-Arias that things would only get worse for him and his family. Castillo-Arias then took his son to a clinic, where he needed reconstructive surgery to repair his mouth and jaw.

The Castillos went to Castillo-Arias's parents' home in the northern section of Cali for the rest of the month. Castillo-Arias attempted to rent his bakery while they were away, but his lessees were intimidated by individuals who would inquire about him, and on more than one occasion, a lessee was harmed after he refused to

divulge information regarding Castillo-Arias's whereabouts. Although Castillo-Arias had never been involved in politics and had never testified against the cartel in a drug trial, Meza recommended that Castillo-Arias go into hiding and, ultimately, leave Colombia.[2]  After Castillo-Arias made two trips to the United States in 1995, the Castillos entered the United States in February 1996 as B-2 visitors for pleasure with authorization to remain in the country until August 8, 1996.

. . . .

On December 10, 1996, in accordance with 8 U.S.C. § 1229(a)(1), the Immigration and Naturalization Service ("the INS") issued show cause orders to the Castillos, charging them under 8 U.S.C. § 1227(a)(1)(B) with having remained in the United States for a longer time than permitted.  At the show cause hearing, the Castillos admitted the factual allegations in the show cause orders and conceded the charge of deportability.  At that time, through counsel, they requested relief from deportation in the form of asylum, withholding of deportation, or at the very least, voluntary departure.[3]

Following a hearing on their requests for relief, [the IJ] denied the Castillos' applications for asylum and withholding of deportation. Initially, the IJ noted that an alien is eligible for asylum under 8 U.S.C. § 1158(b)(1) only if he or she is a "refugee," which is defined as an alien who is unable or unwilling to return to his or her country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  The IJ concluded that even if the Castillos have a fear of harm, that harm does not arise on account of race, religion, nationality, membership in a particular social group, or political opinion.  Instead, the IJ concluded, the threat to the Castillos was

[2] Meza left Colombia for Spain, and it appears that Davila may have been murdered.

[3] It also appears that Castillo-Arias, on behalf of his entire family, had filed an application for asylum with the INS before the show cause orders were issued.

4

based on "retaliation" or "retribution" due to Castillo-Arias's voluntary decision to be an informant against the cartel. (Admin Rec. at 103, 104). On this basis, the IJ denied the Castillos' applications for asylum. And because the Castillos failed to meet the lower burden of proof for establishing eligibility for asylum, the IJ denied withholding of deportation because they could not satisfy the higher burden of proof to qualify for such relief. See 8 U.S.C. § 1253(h)(1) (1994); Al Najjar v. Ashcroft, 257 F.3d 1262, 1303 (11th Cir. 2001). The IJ granted the Castillos' requests for voluntary departure and entered an alternative order of deportation to Colombia.

The Castillos timely filed an appeal to [the BIA]. On appeal, Castillo-Arias and his family argued that they qualified as "refugees" under 8 U.S.C. § 1101(a)(42)(A) because they suffered a well-founded fear of persecution based on (1) a political opinion imputed to Castillo-Arias by the drug cartel and (2) his membership in a particular social group, namely, a group composed of non-criminal informants. The BIA rejected their first argument, holding that the people who threatened the Castillos did so "out of personal motives and not due to any political opinion imputed to [Castillo-Arias]." (Admin. Rec. at 9.) Although the BIA did not separately address their claim based on membership in a particular social group, the BIA ultimately concluded that the record contained insufficient evidence that there was any motivation other than revenge for the aid Castillo-Arias provided to the government, and wrote that "[w]e agree with the Immigration Judge's well-reasoned decision that the respondents have failed to adequately establish that they suffered past persecution or that they have a well-founded fear of persecution on account of a ground protected under the Immigration and Nationality Act." (Id. at 8-9.) As a result, the BIA affirmed the IJ's decision and dismissed the appeal.

Castillo-Arias v. U.S. Att'y Gen., No. 02-12125, slip op. at 2-7 (11th Cir. 25

Aug. 2003) (per curiam) (certain footnotes omitted or renumbered).

5

In that prior appeal, we held that the facts of the case were essentially undisputed, and the only issue was the application of the INA. Castillo-Arias, No. 02-12125, slip. op. at 7. We affirmed the BIA's conclusion that Castillo-Arias was not persecuted on account of his political opinion. Id. at 11-12. However, we held that the BIA's conclusion that Castillo-Arias was targeted by the cartel solely out of revenge was not supported by substantial evidence. Id. at 12-13. Though there was evidence of revenge, a reasonable factfinder would be compelled to conclude that Castillo-Arias produced evidence that the harm was motivated by his membership in a group composed of noncriminal informants. Id. at 13. We then remanded the case to the BIA to decide the sole issue here on appeal, i.e., if noncriminal informants constitute a "particular social group" within the meaning of the phrase in the INA, 8 U.S.C. § 1101(a)(42)(A). Castillo-Arias, No. 02-12125, slip op. at 14-15.

On remand, the BIA concluded that noncriminal informants did not constitute a "particular social group." The BIA relied on Matter of Acosta, 19 I. & N. Dec. 211, 233-34 (BIA 1985), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439, 447 (BIA 1987), as authority for the premise that a "'particular social group'" refers to persons who "'share a common, immutable characteristic.'" R1 at 54 (quoting Matter of Acosta,

19 I. & N. Dec. at 233).  Reiterating <u>Acosta</u>, the BIA stated that members of a particular social group are those persons with a "'shared characteristic. . . such as sex, color, or kinship ties, or in some circumstances . . .  a shared past experience such as former military leadership or land ownership.'"  <u>Id.</u> (quoting <u>Matter of Acosta</u>, 19 I. & N. Dec. at 233).  The BIA noted that this characteristic "'must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'"  <u>Id.</u> (quoting <u>Matter of Acosta</u>, 19 I. & N. Dec. at 233).  It is only in these circumstances that membership in a "particular social group" becomes comparable to the other grounds listed in the statute.  <u>Id.</u>  While reiterating its continued adherence to the <u>Acosta</u> formulation, the BIA's decision also referenced guidelines from the United Nations High Commissioner for Refugees ("UNHCR"), which define a particular social group as

> [a] group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society.  The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

<u>Id.</u> at 55 (citing UNHCR, <u>Guidelines on International Protection:</u> <u>"Membership of a particular social group" within the Context of Article</u> <u>1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status</u>

of Refugees, ¶ 11, U.N. Doc. HCR/GIP/02/02 (May 7, 2002) [hereinafter "UNHCR Guidelines"]).

The BIA then considered whether Castillo-Arias's past acts were "the kind of shared past experience that constitutes membership in a particular social group." Id. at 57. In applying the Acosta formulation, the BIA listed two major considerations: (1) immutability and (2) social visibility. Id. at 57-59. In analyzing immutability, the BIA conceded that "[a] past experience is, by its very nature immutable, as it has already occurred and cannot be undone." Id. at 57. The BIA noted, however, that this fact "does not mean that any past experience that may be shared by others suffices to define a particular social group for asylum purposes." Id.

Analogizing noncriminal informants to occupations like the police or military, the BIA stated that "we do not afford protection based on social group membership to persons exposed to risks normally associated with employment in [such] occupations." Id. (citing Matter of Fuentes, 19 I. & N. Dec. 658 (BIA 1988)). While noting that a former member of the national police could conceivably demonstrate membership in a particular social group, the BIA cautioned that "if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be

8

considered, without more, to have been targeted as a member of a particular social group." Id. The BIA further concluded that those who accept such employment are aware of the risks involved in the disruption of criminal activity. Id. Similarly, the BIA noted that those who inform on criminal activity are also aware of similar dangers. It also dismissed the distinction between compensated informants and uncompensated, civic-minded informants as "not particularly helpful in addressing the question of who is deserving of protection under the asylum law." Id. at 57.

In analyzing social visibility, the BIA stressed that its "other decisions recognizing particular social groups involved characteristics which were highly visible and recognizable by others in the country in question." Id. at 58. The BIA noted that the two illustrations provided in Acosta, "'former military leadership and land ownership'––are also easily recognizable traits." Id. (quoting Matter of Acosta, 19 I. & N. Dec. at 234). Once again referencing the UNHCR Guidelines, the BIA stated that while "'persecutory action toward a group may be a relevant action in determining the visibility of a group in a particular society,'" the social group was not meant to be a catch-all and "'cannot be defined exclusively by the fact that it is targeted for persecution.'" Id. (quoting UNHCR Guidelines ¶¶ 2, 14 (emphases in original)).

9

With regard to confidential informants, the BIA noted that "the very nature of the conduct at issue is such that it is generally out of the public view," and it thereby concluded that informants lacked the necessary social visibility to be recognized as a "particular social group." Id. In ultimately denying Castillo-Arias's appeal and affirming the IJ's decision, the BIA raised additional concerns about the numerosity and inchoateness of informants and noted that the cartels have been known to target the population in general in order to intimidate potential witnesses and anyone perceived to have interfered with its operations. Id. at 59. The Castillos then timely appealed the BIA's decision.

## II. DISCUSSION

A. Standard of Review

To the extent that the BIA's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). However, as we noted in our previous decision, "[de novo] review of the BIA's interpretation is informed by the principle of deference articulated in  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984)." Castillo-Arias, No. 02-12125, slip op. at 9-10.

10

The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute which it administers. Chevron, 467 U.S. at 842-44, 104 S. Ct. at 2781-82. First, if congressional purpose is clear, courts and administrative agencies "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S. Ct. at 2781. A second level of review, however, is triggered when "the statute is silent or ambiguous with respect to the specific issue." Id. at 843, 104 S. Ct. at 2782. "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 844, 104 S. Ct. at 2782; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S. Ct. 1439, 1445 (1999) ("[T]he BIA should be accorded Chevron deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." (quotations omitted)); Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 n.4 (11th Cir. 2001) ("The degree of deference is especially great in the field of immigration."). An agency's interpretation is deemed reasonable unless it is "arbitrary, capricious, or clearly contrary to law." Alabama Power Co. v. Fed. Energy Regulatory Comm'n, 22 F.3d 270, 272 (11th Cir. 1994).

11

At issue in this case is the BIA's interpretation of the statutory phrase "particular social group." Under the INA, an alien who arrives in or is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The BIA, through the Attorney General, has the discretion to grant asylum if the alien meets the INA's definition of a "refugee." See id. § 1158(b)(1)(A); Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). In addition, the asylum applicant carries the burden of proving statutory "refugee" status. Al Najjar, 257 at 1284. In relevant part, a "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A) (emphasis added). With regard to withholding of deportation (now removal), the Attorney General may not deport an alien if his life or freedom would be threatened in that country because of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (1994) (emphasis added) (now codified at 8 U.S.C. § 1231(b)(3)(A)).

Congress did not directly speak on the issue of what constitutes a "particular social group," one of the five listed categories that qualify for refugee status or withholding of deportation, within the meaning of the INA. See 8 U.S.C. § 1101(a)(42)(A); id. § 1253(h)(1) (1994) (now codified at 8 U.S.C. § 1231(b)(3)(A)). Accordingly, we must follow the BIA's determination that noncriminal informants working against the Cali cartel are not a social group under the INA unless the interpretation is unreasonable, i.e., arbitrary, capricious, or clearly contrary to law. See Alabama Power Co., 22 F.3d at 272.

B. Whether the BIA's Interpretation Is Reasonable

The Castillos argue that the BIA's interpretation of "particular social group," which excludes noncriminal informants working against the Cali drug cartel, was unreasonable. In so doing, they contend that other social groups that have qualified under the INA are neither more visible nor recognizable than noncriminal informants or former informants. They further assert that the BIA put forth contradictory rationales in concluding that noncriminal informants do not qualify as a particular social group. Additionally, they contend that Castillo-Arias's family members have suffered derivative persecution on the basis of his status as a noncriminal informant.

13

To date, we have not expressly reviewed, under <u>Chevron</u>, the BIA's legal definition of "particular social group."  There are six circuits who have deferred to the <u>Acosta</u> formulation.  <u>See</u> <u>Thomas v. Gonzales</u>, 409 F.3d 1177, 1184-87 (9th Cir. 2005) (en banc); <u>Niang v. Gonzales</u>, 422 F.3d 1187, 1199 (10th Cir. 2005); <u>Silva v. Ashcroft</u>, 394 F.3d 1, 5 (1st Cir. 2005); <u>Castellano-Chacon v. INS</u>, 341 F.3d 533, 546-48 (6th Cir. 2003); <u>Lwin v. INS</u>, 144 F.3d 505, 511-12 (7th Cir. 1998); <u>Fatin v. INS</u>, 12 F.3d 1233, 1238-40 (3d Cir. 1993).   Two circuits, while not expressly deferring to the BIA's legal definition of "particular social group," have viewed <u>Acosta</u> favorably.  <u>See</u> <u>Lopez-Soto v. Ashcroft</u>, 383 F.3d 228, 235 (4th Cir. 2004) (citing the <u>Acosta</u> formulation in support of including "family" within "particular social group"); <u>Ontunez-Tursios v. Ashcroft</u>, 303 F.3d 341, 352 (5th Cir. 2002) (citing to <u>Acosta</u> and restating the <u>Acosta</u> formulation).  Two other circuits, however, may differ in some respects with the general definition as stated in <u>Acosta</u>.  <u>See</u> <u>Safaie v. INS</u>, 25 F.3d 636, 640 (8th Cir. 1994) (noting that the "principal concern [regarding a "particular social group"] is a 'voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group'" (citation omitted)), <u>superceded by statute on other grounds recognized by</u> <u>Rife v. Ashcroft</u>, 374

14

F.3d 606, 614 (8th Cir. 2004); Gomez v. INS, 947 F.2d 660, 664 (2d Cir. 1991) (defining "a particular social group" as "comprised of individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor–or in the eyes of the outside world in general").

As an initial matter, we join our sister circuits who have deferred to the BIA's Acosta formulation of "particular social group."  The expertise necessary to craft this definition is well within the BIA's bailiwick and is neither arbitrary, capricious, nor clearly contrary to law.  See Alabama Power Co., 22 F.3d at 272.  We do not doubt the reasonableness of the BIA's requirement of a "common, immutable characteristic . . . [that] is fundamental to [its members'] individual identities or consciences," which is consonant with the purposes that underlie the other four grounds for refugee status or withholding of deportation under the INA.  See Matter of Acosta, 19 I. & N. Dec. at 233-34.  Furthermore, Acosta strikes an acceptable balance between (1) rendering "particular social group" a catch-all for all groups who might claim persecution, which would render the other four categories meaningless, and (2) rendering "particular social group" a nullity by making its requirements too stringent or too specific.  Reference to the UNHCR Guidelines by the BIA in elucidating the Acosta formulation is

15

permissible because the U.S. Supreme Court has held that Congress intended to conform United States refugee law with the 1967 United Nations Protocol Relating to the Status of Refugees. See INS v. Cardoza-Fonseca, 480 U.S. 421, 436-37, 107 S. Ct. 1207, 1215-16 (1987); see also Castellano-Chacon, 341 F.3d at 546-48 (noting that "[t]he UNHCR takes the Second Circuit's approach, in that the external perception of the group can be considered as an additional factor" and that "[a]s the BIA continues to revise and evaluate its own definition of a particular social group, our definition may evolve in the same way as the BIA's, with the caveat that the BIA must continue to make a reasonable interpretation").

We also apply Chevron deference to the BIA's further articulation of the Acosta formulation with regard to the eligibility of noncriminal informants who work against the Cali cartel. See Aguirre-Aguirre, 526 U.S. at 425, 119 S. Ct. at 1445; Cardoza-Fonseca, 480 U.S. at 448, 107 S. Ct. at 1221 ("In [the] process of filling any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." (quotations omitted) (emphasis added)). In so doing, we conclude that the BIA's legal determination that noncriminal informants do not fall within the Acosta formulation is also reasonable.

Here, the BIA noted that Castillo-Arias's activity as an informant is an historic fact which is immutable, but is not necessarily an experience shared by others that is sufficient to define a social group for asylum purposes. R1 at 57. Narcotics traffickers, such as the cartel, threaten "anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises." Id. at 59. For this reason, informants against the cartel often intend to remain undiscovered. Id. at 58. Generally, those informants who remain anonymous are not visible enough to be considered a "particular social group," as the very nature of the activity prevents them from being recognized by society at large.

Thus, the social visibility of informants is different in kind from the particular social groups that have been afforded protection under the INA. See, e.g., Matter of V-T-S-, 21 I. & N. Dec. 792, 798 (BIA 1997) (Filipinos of mixed Filipino-Chinese ancestry); Matter of Kasinga, 21 I. & N. Dec. 357, 365-66 (BIA 1996) (young women of a particular tribe who were opposed to female genital mutilation); Matter of Toboso-Alfonso, 20 I. & N. Dec. 819, 822-23 (BIA 1990) (persons listed by the government as having the status of homosexual); Matter of Fuentes, 19 I. & N. Dec. at 662 (former members of the national police); Matter of Acosta, 19 I. & N. Dec. at 234 (former military leadership and land ownership). Insofar as informants share

17

some characteristics with former members of the national police, they are nonetheless distinguishable. First, the BIA emphasized that it did not afford protection to "persons exposed to risks normally associated with employment in occupations such as the police or military." R1 at 57. Second, even if former members of the national police were targeted based on their status as former police officers, the decision to afford protection under the INA is situationally dependent. See R1 at 57 ("[A] former police officer could conceivably demonstrate persecution based on membership in a particular social group.") (emphasis added).

In Matter of Fuentes, the BIA noted that mistreatment occurring because of the status of being a former member of the national police "in appropriate circumstances" could be found to be persecution on account of membership in a particular social group. 19 I & N Dec. at 662 (emphasis added). The only example provided in Fuentes as an appropriate circumstance was when the former police officers would be targeted based on their status after "hostilities have ceased." See id. In this case, there is no evidence that the Cali cartel has ceased its hostilities. Furthermore, there is nothing in the record that would compel us to conclude that noncriminal informants working against the Cali cartel warrant an exception to the general rule that those who engage in risks similar to those of the police or

18

military, regardless of motive, do not receive protection as a particular social group under the INA.

To the extent that there are noncriminal informants that do not keep their activities secret, the BIA reasonably concluded that they still do not constitute a "particular social group" under the INA because there is no evidence that the cartel would treat them any differently from any other person the cartel perceived to have interfered with its activities. The risk of persecution alone does not create a particular social group within the meaning of the INA, as virtually the entire population of Colombia is a potential subject of persecution by the cartel. See R1 at 59. While they may be recognizable after their activities have been disclosed to the cartel or to society, their defining attribute is their persecution by the cartel. As stated previously, "particular social group" should not be a "catch all" for all persons alleging persecution who do not fit elsewhere. In restricting the grounds for asylum and withholding of deportation based on persecution to five enumerated grounds, Congress could not have intended that all individuals seeking this relief would qualify in some form by defining their own "particular social group." See 8 U.S.C. § 1101(a)(42)(A); id. § 1253(h)(1) (1994) (now codified at 8 U.S.C. § 1231(b)(3)(A)). Accordingly,

19

the BIA's conclusion that noncriminal informants were not visible enough to be considered a social group was reasonable.

We now turn to the BIA's additional concerns regarding the numerosity and inchoateness of noncriminal informants. We believe that these concerns are valid. See Ochoa v. Gonzales, 406 F.3d 1166, 1171 (9th Cir. 2005) (holding that Colombian business owners who rejected demands from narcotics traffickers are "too broad to qualify as a particularized social group" because "[t]here is no unifying relationship or characteristic to narrow this diverse and disconnected group"). Moreover, despite the Castillos's assertions, there is nothing contradictory in concluding that a group of informants are, for purposes of the INA, both not visible enough, and, at the same time, potentially too numerous or inchoate. The fact that a characteristic or association is shared by a large number of people does not mean that either society at large, let alone other members within that same group, will recognize that characteristic or association. This is especially so when the characteristic or association is inherently secretive. Because we conclude that the BIA's interpretation of the INA is reasonable with regard to noncriminal informants, we need not determine whether Castillo-Arias's family has suffered derivative persecution on that basis.

20

As we are required to do, we have given the requisite deference to the BIA's interpretation of the INA. However, we are dismayed that these petitioners, who risked their lives and the safety of their families to assist our nation's allies in the "war on drugs," have been ignored by our nation. We regret that Congress has not deemed it appropriate to craft some legislative relief for these individuals and those similarly situated. Perhaps the compelling facts in this case and its troublesome resolution might be the impetus for such relief.

## III. CONCLUSION

Having previously concluded that the Castillos's eligibility for asylum and withholding of deportation turned upon whether noncriminal informants working against the Cali cartel constitute a "particular social group" within the meaning of the INA, we remanded this action to the BIA. On remand from our court, the BIA concluded that noncriminal informants do not constitute a "particular social group" under the INA. Back on appeal, we conclude that the BIA's interpretation of the INA was reasonable. Notwithstanding their very sympathetic personal circumstances, the Castillos are ineligible for asylum or withholding of deportation. **PETITION DENIED.**