[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-15914
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 10, 2008
THOMAS K. KAHN
CLERK

BIA No. A98-440-000

ALEXIA MARGINE ORTEZ-LOPEZ,
a.k.a. Margine Ortez-Lopez,

                                                        Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(July 10, 2008)**

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Alexa Ortez-Lopez, a native and citizen of Nicaragua, petitions for review of

the order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") removal order and denial of her application for asylum, withholding of removal and CAT relief. After review, we deny the petition.

## I. BACKGROUND

In 2005, Ortez-Lopez and her twelve-year-old son illegally crossed the border in Arizona and were detained by United States Border Patrol agents. Ortez-Lopez was served with a notice to appear, charging her with removability under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without being admitted or paroled. Ortez-Lopez conceded removability.

### A. Asylum Application

On January 12, 2006, Ortez-Lopez filed an application for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and for relief under the United Nations Convention Against Torture ("CAT"). Ortez-Lopez's affidavit stated that she came to the United States in 1993, worked and sent money to her children and mother in Nicaragua. In October 2004, Ortez-Lopez returned to Nicaragua, where she owned her own business and a car she shipped to Nicaragua from the United States. Ortez-Lopez's application claimed that, after her return to Nicaragua, she had been persecuted by a street gang called Poxis based on her membership in a particular social group. Her application did not identify the social group, but addressed two attacks by Poxis.

2

Specifically, on December 8, 2004, the Poxis gang robbed Ortez-Lopez at her home. Ortez-Lopez believes the gang robbed her because it thought she was well off given that she owned her business, had a nice car and was well dressed. Ortez-Lopez reported the robbery to the police and identified one of the robbers in a police line-up.[1] Subsequently, some Poxis members sent a threat through her son that she would suffer "the consequences" because she recognized one of them. The police detained the man identified by Ortez-Lopez for a few days before releasing him.

On December 20, 2004, six Poxis members attacked Ortez-Lopez. According to Ortez-Lopez, the attack was an "act of revenge against [her] for reporting to the police the robbery of [her] home and identifying one of . . . their members." The men beat, raped and bit Ortez-Lopez. Ortez-Lopez reported the incident to the police, but did not tell them about the rape because she was ashamed and abused women in Nicaragua do not have any rights.[2] The police treated Ortez-Lopez's report as an "ordinary report," and Ortez-Lopez believes that the police did not want to investigate because they were afraid of the armed street

---

[1]Ortez-Lopez submitted a police report indicating that, on December 8, 2004, she was robbed by five individuals carrying guns, one of whom she recognized as a past member of a Sandinista group.

[2]A police report indicated that, on December 20, 2004, Ortez-Lopez reported an attack by three men who bit her, stole her jewelry and threatened her children's safety if she reported the incident.

gangs. Fearing for her daughter's safety, Ortez-Lopez sent her to a boarding school away from their home town.

Ortez-Lopez's affidavit described a climate in Nicaragua in which the police are unwilling and unable to protect women from abuse either in their homes or on the street. As examples, Ortez-Lopez cited a friend who was attacked and raped by Poxis members and news reports of widespread sexual abuse and violence against women that the government did not investigate or punish. Prior to coming to the United States in 1993, Ortez-Lopez also was abused by her son's father throughout their relationship.[3] Ortez-Lopez did not report this abuse to the police because she believed they would not help her. Ortez-Lopez submitted various newspaper articles that discussed incidents of violence in Nicaragua and indicated that Nicaragua has a problem with criminal violence.

Finally, Ortez-Lopez's affidavit stated that between 1995 and 1997, her family worked with the Contras, the resistance movement working against the Sandinistas, and that she and her father helped the Contras with food and clothes. However, between 1995 and 1997, the Sandinistas were not in power in Nicaragua, and Ortez-Lopez was living in the United States. At the hearing, Ortez-Lopez explained that her family actually opposed the Sandinistas in the 1980s (when the

---

[3]Ortez-Lopez did not provide dates for this relationship in her affidavit; however, her hearing testimony indicated that the relationship occurred prior to her leaving for the United States in 1993 and lasted four years.

Sandinistas were in power) and were involved in a group called La Residencia, which brought food, clothing and medicine to the Contras in the mountains. Ortez-Lopez testified that she also opposes the Sandinistas, but admitted that she was never harmed by them when she lived in Nicaragua prior to 1993 and she did not fear them when she returned to Nicaragua in 2004 because they were no longer in power.

**B.    Country Reports**

The government submitted the 2004 and 2005 Country Reports on Human Rights Practices in Nicaragua ("Country Reports"), which indicated that domestic and sexual violence against women was widespread and underreported. However, Nicaraguan law criminalized sexual abuse and provided for a prison sentence of between 9 and 48 months for anyone convicted of physically abusing or raping another person. Although funding limited the staff size, Nicaraguan police managed 24 "women's commissariats" with police officers, social workers, a psychologist and a lawyer who provided social and legal help to women.

**C.    Hearing**

At an asylum hearing, the IJ noted that Ortez-Lopez was requesting asylum based on her political opinion and membership in a particular social group. When the IJ asked Ortez-Lopez what social group, her counsel stated that Ortez-Lopez was a woman subjected to sexual abuse and domestic violence.

5

Ortez-Lopez's testimony was generally consistent with her asylum application. According to Ortez-Lopez, when she was robbed at her house, the men pointed a gun at her and asked where her money was. They took a video camera and her money. They told her to shut up, not to scream and not to say anything.

After Ortez-Lopez identified one assailant for the police, she began to receive anonymous threatening telephone calls telling her to "shut [her] mouth" and not talk. Ortez-Lopez believed these calls were from the Poxis gang.

During the second attack when Ortez-Lopez was raped, she was told that the attack was happening because of her "loud mouth." One of the men who raped her was the man she identified to the police after the robbery. After the second attack, Ortez-Lopez paid $250 a month for private security. She stated that the same group from Poxis also raped a friend of hers. When asked whether Poxis was a "big organization or just a street gang in your neighborhood," Ortez-Lopez stated that it was a street gang.

In Nicaragua, Ortez-Lopez owned a four-bedroom home and land on which she planned to build another house. After coming to the United States illegally, Ortez-Lopez's son lived with her, but her daughter was in boarding school in Nicaragua and her parents lived in Nicaragua. Ortez-Lopez admitted that she stated in a border patrol interview that she was entering the United States to find a

job and did not mention her treatment by Poxis or her fear of returning to Nicaragua. Ortez-Lopez explained that this omission was due to shame and nervousness. In a later asylum interview, she recounted her robbery and rape.

During her testimony, Ortez-Lopez stated that she was seeking political asylum. However, during closing argument, her counsel stated that Ortez-Lopez's case was somewhat unusual because it was not a case of political opinion or religious persecution, but went to her status as a woman in a male-dominated country.

## D.    IJ and BIA Decisions

After finding Ortez-Lopez's testimony credible, the IJ denied Ortez-Lopez asylum and withholding of removal because her status as a woman who was a victim of abuse did not constitute membership in a protected social group and she was not mistreated "on account of" her political opinion. The IJ found that it was the Poxis gang's actions (in 2004) and not the domestic violence by her son's father (prior to 1993) that caused her to come to the United States in 2005.

The IJ found that the Poxis gang's robbery of Ortez-Lopez was an economic crime and their subsequent rape of Ortez-Lopez was a crime of revenge in response to her reporting the robbery to the police. The IJ found that Ortez-Lopez's opposition to the Sandinistas had occurred too far in the past to provide a basis for granting asylum or withholding of removal. The IJ noted that her parents, who

7

also resisted the Sandinistas, were living in Nicaragua without any problems and that Ortez-Lopez had not sought political asylum in 1993, when she first entered the United States, despite the fact that it was closer in time to her political opposition to the Sandinistas.

Finally, the IJ found that, because Poxis members were not government officials and the government had not acquiesced in Poxis's treatment of Ortez-Lopez, Ortez-Lopez was not entitled to CAT relief.

Ortez-Lopez appealed to the BIA, which adopted and affirmed the IJ's decision. The BIA found that any claim based on abuse from her son's father or her support for anti-Sandinista Contras failed. The BIA also rejected her claim based on family membership because Ortez-Lopez's family remained in Nicaragua without any problems or persecution. The BIA agreed with the IJ's finding that the Poxis gang attacked Ortez-Lopez to enrich themselves and retaliate against her for reporting their crimes to the police and with the IJ's conclusion that this was not persecution on account of a protected ground. The BIA affirmed the IJ's denial of CAT relief because nothing in the record indicated the Nicaraguan government was complicit in or acquiesced to the Poxis gang's activities. Ortez-Lopez timely petitioned for review.[4]

---

[4]We "review[ ] only the decision of the BIA, except to the extent that it expressly adopts the IJ's opinion." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007). Here, the BIA adopted the IJ's reasoning, but also discussed why it agreed with the IJ. We review legal

## II. DISCUSSION

### A.    Asylum & Withholding of Removal

To establish asylum eligibility, an alien must, with specific and credible evidence, establish either (1) past persecution on account of a statutorily listed factor or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution.  8 C.F.R. § 208.13(a), (b).  Past persecution is established when the applicant shows that (1) she was persecuted, and (2) that the persecution was on account of a protected ground.  Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006).  "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" a statutorily listed factor.  Al Najjar v. U.S. Att'y Gen., 257 F.3d 1262, 1287 (11th Cir. 2001) (quotation marks and emphasis omitted).[5]  "[E]vidence that either is consistent with acts of private violence . . . or that merely shows that a person has been the victim of criminal activity[,] does not

conclusions de novo and factual findings under the substantial evidence test.  Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc); Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001).  "Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Adefemi, 386 F.3d at 1027.  The fact that evidence in the record may support a conclusion contrary to the administrative findings is not enough to justify a reversal.  Id. Rather, reversal is only appropriate where the record "compels" it.  Id.

[5]Under the REAL ID Act's amendments to the INA, an applicant need only show that a protected ground "was or will be at least one central reason for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i).  Ortez-Lopez's application is governed by the REAL ID Act because it was filed after May 11, 2005.  See Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 231, 305.

constitute evidence of persecution based on a statutorily protected ground." Ruiz

v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006).

An alien who has not shown past persecution may still be eligible for asylum if she can demonstrate a future threat to her life or freedom on a protected ground upon removal to her country. 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2). To establish a "well-founded fear" of persecution, an applicant must show that she has a fear of persecution in her home country and that "there is a reasonable possibility of suffering such persecution if he or she were to return to that country." Id. § 208.13(b)(2)(i). Further, "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289.[6]

Here, substantial evidence supports the finding that the robbery and attack of Ortez-Lopez by the Poxis gang were crimes motivated by the criminals' self-interest. Ortez-Lopez's affidavit asserted she was robbed because the Poxis gang thought she was well off and she was subsequently attacked and raped as an "act of revenge" for reporting the robbery to the police and identifying one of the gang's

---

[6]Similarly, to qualify for withholding of removal under the INA, an alien must show that if returned to her country, the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). Generally, when an alien fails to meet the standard for establishing asylum eligibility, the alien cannot establish the higher burden for withholding of removal. Al Najjar, 257 F.3d at 1292-93.

members.

Ortez-Lopez contends that she presented evidence that Poxis had mixed motives, at least one of which was a protected ground.[7] Ortez-Lopez suggests that her opposition to Poxis by reporting the robbery to the police and her wealth were motives. If true, she still would not be entitled to relief because neither constitutes a protected ground. See 8 U.S.C. § 1158(b)(1)(B)(I) (listing the protected grounds as "race, religion, nationality, membership in a particular social group, or political opinion . . ."). People who cooperate with the police are not members of a particular social group. See Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1196 (11th Cir. 2006). Nor are people who are persecuted for merely resisting or refusing to cooperate with armed gangs being persecuted on account of a political opinion. See Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004).

Furthermore, wealthy people do not constitute a particular social group within the meaning of the INA. See Ucelo-Gomez v. Mukasey, 509 F.3d 70, 72-74 (2d Cir. 2007). Nor is targeting the wealthy for extortionate purposes persecution on account of a political opinion. See Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821-22 (11th Cir. 2007).

Ortez-Lopez also argues that Poxis was motivated in part by her family's

---

[7]We conclude that Ortez-Lopez has exhausted her administrative remedies and reject the government's claim that we lack jurisdiction to review Ortez-Lopez's claim of political persecution.

11

opposition to the Sandinistas in the 1980s and by her status as a woman, but there is no evidence to support either claim. In short, the evidence does not compel a conclusion that Poxis persecuted Ortez-Lopez, even in part, on account of a protected ground or that Ortez-Lopez would be persecuted by Poxis in the future on account of a protected ground. Accordingly, substantial evidence supports the denial of Ortez-Lopez's application for asylum and withholding of removal.

**B.     CAT Relief**

To be entitled to CAT relief, an applicant must establish that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The applicant must show that the torture was "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id. § 208.18(a)(1). The alien must demonstrate that the feared torture would be by the government or with the government's acquiescence, i.e., that the government is aware of misconduct that it has a duty to prevent and fails to intervene. Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 891 (11th Cir. 2007). However, a government's failure to catch a persecutor does not mean that it acquiesced in the harm. Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004).

Substantial evidence supports the BIA's and IJ's denial of Ortez-Lopez's application for CAT relief. The evidence demonstrates that, although violence

12

against women is a problem in Nicaragua, the government has set up "women's commissariats" staffed with police and other professionals to assist women who are victims of crime. In Ortez-Lopez's case, the police investigated Ortez-Lopez's reports and detained the man she identified as one of her robbers. The mere fact that the Nicaraguan police released this man after a few days does not demonstrate acquiescence to torture.

**PETITION DENIED.**