[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13054
Non-Argument Calendar

_____

Agency No. A209-219-187

ALMA MARISOL LOPEZ-DIAZ,
JOSE ALEXANDER TREJO-LOPEZ,
JOSUE NEFTALI TREJO-LOPEZ

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 8, 2020)

Before WILLIAM PRYOR, GRANT and LUCK, Circuit Judges.

PER CURIAM:

Alma Marisol Lopez-Diaz, a native and citizen of El Salvador, and her

children, as derivative beneficiaries, petition this Court to review the denial of her

application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. *See* 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). Lopez-Diaz, a store owner, and her children entered the United States illegally to escape extortion by members of the MS-13 gang. The Board of Immigration Appeals agreed with the immigration judge that Lopez-Diaz failed to prove that she was a member of a particular social group, that a nexus existed between a protected ground and a harm that she faced, or that she was likely to be tortured when she returned to El Salvador. We deny Lopez-Diaz's petition.

## I. BACKGROUND

At the end of March 2016, members of the MS-13 gang demanded money from Lopez-Diaz three times inside her store, which was attached to her home. During the first incident, Lopez-Diaz responded she could not pay, and the gang members pointed a gun at her stomach and stole some goods as they left her store. When the gang members returned a few days later, Lopez-Diaz again pleaded poverty, and the gang members pointed a gun at her head and pilfered cigarettes and food. On March 25, 2016, Lopez-Diaz reported the two incidents to law enforcement in San Miguel. Two days later, the gang members appeared a third time, and when Lopez-Diaz could not pay, they threatened to harm her children. Lopez-Diaz and her children promptly left their home and fled to the United States.

2

After the Department of Homeland Security detained Lopez-Diaz, she applied for asylum, withholding of removal, and relief under the Convention. Lopez-Diaz alleged that she had suffered past persecution and feared future persecution from members of the MS-13 gang. She asserted that she was persecuted based on her membership in two particular social groups: "individuals and family members who have been targeted [for] violent crimes and are seen as benefiting from current socioeconomic structures because of perceived wealth associated with presence in and family ties to the United States" and "business owners in El Salvador." Lopez-Diaz attached to her application copies of her police report; letters from neighbors and friends recounting Lopez-Diaz's stories about being extorted and threatened; and several reports recounting the conditions in El Salvador, including the 2016 Human Rights Report, the 2017 Travel Warning, and the 2016 Crime and Safety Report.

During her removal hearing, Lopez-Diaz testified about the three incidents with members of the MS-13 gang and about her departure from El Salvador. Lopez-Diaz testified that, after she closed her store, she and her children traveled to the capital city of El Salvador, where they stayed for several days until leaving the country. She also testified that a man with whom her brother had worked had been killed by members of the MS-13 gang because he refused to pay them. When questioned on cross-examination, Lopez-Diaz admitted that she did not know

whether police in El Salvador had arrested anyone based on her complaint and that she failed to report the third incident of extortion to the police.

The immigration judge denied Lopez-Diaz immigration relief, and the Board dismissed Lopez-Diaz's appeal. The Board agreed with the immigration judge that Lopez-Diaz was not entitled to asylum or withholding of removal because she identified no cognizable particular social group in which she was a member and because no nexus existed between the harm she experienced and a protected ground. The Board found that Lopez-Diaz's first proposed group was "too expansive as [it] includes individuals from all segments of Salvadorian society who are perceived to have wealth" and was "overbroad and diffuse because 'victims of gang violence come from all segments of society'" and gang members were unlikely to differentiate among wealthy persons within "the general population of El Salvador." And the Board rejected as "unavailing" Lopez-Diaz's "attempt to narrow the proposed group of those with perceived wealth by referring to family ties to the United States . . . as her testimony did not indicate that the gang members were motivated by her family ties to the United States." The Board also found that Lopez-Diaz's second proposed group was not cognizable because "[t]he risk of persecution . . . [to business owners did] not create a particular social group" and "[t]he fact that business owners were convenient targets for extortion did not show that they were 'a particular social group.'" The Board found that

4

Lopez-Diaz failed to establish that she suffered past persecution or faced a likelihood of future persecution on account of a protected ground because the gang members' "motives in extorting and threatening [her] in March 2016 were criminal in nature . . . ."

The Board also affirmed the finding of the immigration judge that Lopez-Diaz was not entitled to relief under the Convention. The Board stated that Lopez-Diaz failed to "meaningfully challenge the specific reasons that the Immigration Judge provided for denying her application for protection under the Convention Against Torture." And the Board found that Lopez-Diaz "was never threatened or harmed by the police or government" and presented no evidence that she would "likely be tortured in El Salvador by or at the instigation of, or with the consent or acquiescence of, a public official or person acting in an official capacity."

## II. STANDARDS OF REVIEW

We review *de novo* the legal conclusions of the Board. *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1308 (11th Cir. 2013). Because the Board agreed with the findings of the immigration judge, we review the decisions of the Board and the immigration judge. *Id.* Our review of the decision is limited by "the highly deferential substantial evidence test," under which we must affirm if the decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1237 (11th Cir.

5

2006) (internal quotation marks omitted). We do not disturb factual findings unless the record compels a reversal. *Rodriguez*, 735 F.3d at 1308.

### III. DISCUSSION

Lopez-Diaz raises two arguments. First, she argues that she was entitled to asylum and withholding of removal because she was harmed on account of her membership in two particular social groups in El Salvador: persons who have been targeted for violent crimes because of their perceived wealth associated with family ties to the United States and business owners in El Salvador. Second, she argues that she was entitled to relief under the Convention because, if she returns to her homeland, she is likely to be tortured by members of gangs because the government is aware of and fails to protect its citizens against gang violence and because relocation is not a reasonable option due to the existence of criminal gangs throughout the country.

*A. Lopez-Diaz Fails to Identify Error in the Decision to Deny Her Applications for Asylum and Withholding of Removal.*

For Lopez-Diaz to qualify for asylum and withholding of removal, she had to prove she was a member "in a particular social group" for which she suffered past persecution, 8 U.S.C. § 1158(b)(1)(A), and harbored an objectively reasonable fear that her "life or freedom would be threatened in [her] country" upon her return, *id.* § 1231(b)(3)(A). To qualify as "a particular social group," *id.* § 1101(a)(42)(A), Lopez-Diaz's proposed groups had to consist of "persons who

share a common, immutable characteristic that . . . [they] either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences," *Rodriguez*, 735 F.3d at 1310. She also had to prove that her "membership in a particular social group . . . was or will be at least one central reason for persecuti[on]." 8 U.S.C. § 1158(b)(1)(B)(i). In addition, Lopez-Diaz had to "present specific, detailed facts" that she suffered past persecution and that she fears "be[ing] *singled out* for persecution on account of a protected ground." *Rodriguez*, 735 F.3d at 1310 (alteration adopted) (quoting *Najjar v. Ashcroft*, 257 F.3d 1262, 1287 (11th Cir. 2001)).

The Immigration and Nationality Act does not define "particular social group," so we make that determination based on the criteria designed by the Board. *Castillo-Arias v. U.S Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006). A particular social group has three defining characteristics: immutability; social distinction; and particularity. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 404 (11th Cir. 2016). To have immutability, the members of the group must have a common characteristic other than a shared risk of being persecuted that they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Castillo-Arias*, 446 F.3d at 1193 (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). A group achieves social distinction when society in the homeland recognizes it as a group and its members

7

are not too numerous or inchoate. *Rodriguez*, 735 F.3d at 1310 (citing *Castillo-Arias*, 446 F.3d at 1198); *Matter of W-G-R-*, 26 I. & N. Dec. 208, 216–18 (BIA 2014); *see also Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1310–11 (11th Cir. 2019) (holding that a group defined, in part, based on family ties between Mexico and the United States was impermissibly inchoate and numerous). And a group is particular if it has "characteristics that provide a clear benchmark for determining who falls within that group" that make it "discrete and [give it] definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective." *Matter of W-G-R-*, 26 I. & N. Dec. at 214.

The Board did not err in determining that Lopez-Diaz's two proposed groups were not cognizable social groups. Both of Lopez-Diaz's proposed groups lack immutability because the risk of persecution that Lopez-Diaz seeks to escape as a person and as a business owner —violent crimes perpetrated by criminal gangs—is faced by virtually every citizen of and business owner in El Salvador. *See Castillo-Arias*, 446 F.3d at 1198. Her two proposed groups also lack social distinction because the record shows that a large percentage of the El Salvadoran population has likely been the target of violent crime. *See id.*

Lopez-Diaz's two proposed groups also do not qualify as distinctive subgroups of society for other reasons. Her first proposed group lacks immutability because wealth is not something fundamental to an individual's identity, *see*

8

*Rodriguez*, 735 F.3d at 1310, and lacks particularity because wealth turns on subjective perception and results in too broad a group, *see Castillo-Arias*, 446 F.3d at 1198. Lopez-Diaz's first proposed group also lacks particularity even with its members' family ties to the United States because of the undefined number of El Salvadorians who share that characteristic. *See Perez-Zenteno*, 913 F.3d at 1311. And Lopez-Diaz's second proposed group of business owners in El Salvador lacks immutability. *See Matter of Acosta*, 19 I. & N. Dec. 211, 234 (BIA 1985) ("[T]he internationally accepted concept of refugee simply does not guarantee an individual the right to work in the job of his choice."). Lopez-Diaz's "membership in the group of [store owners] was something [she] had the power to change . . . to avoid persecution by the [MS-13 gang] . . . ." *Id.*

Even if we were to assume, like the Board, that Lopez-Diaz's proposed groups qualify as particular social groups, substantial evidence supports the finding that she did not qualify for asylum and withholding of removal because no nexus exists between her membership in those groups and the harm she suffered or she feared would occur if she returned to El Salvador. The reports submitted by Lopez-Diaz reflected that virtually everyone in El Salvador with money, not just business owners or those perceived as wealthy due to familial ties to the United States, were subject to extortion and violent crimes. And evidence that criminal gangs targeted a majority of the population in El Salvador supports the finding of the Board that

9

Lopez-Diaz had not been harassed and another business owner had not been killed on account of their status as business owners.

Lopez-Diaz fails to qualify for asylum or withholding of removal. When "an applicant is unable to meet the 'well-founded fear' standard for asylum, [she] is generally precluded from qualifying for either asylum or withholding of deportation." *Najjar*, 257 F.3d at 1292–93. Because Lopez-Diaz failed to satisfy her burden to qualify for asylum, she cannot satisfy the higher standard required to qualify for withholding of removal.

### B. Substantial Evidence Supports the Decision to Deny Lopez-Diaz's Application for Relief Under the Convention.

To qualify for relief under the Convention, Lopez-Diaz must prove that it is more likely than not that she would be tortured when she returns to El Salvador. *Najjar*, 257 F.3d at 1303. Torture is defined as any act intended to cause "severe pain and suffering, whether physical or mental" that is inflicted by, under the direction, or with the acquiescence of a public official or person acting in an official capacity. 8 C.F.R. § 208.18(a)(1). "Acquiescence" requires that a public official have awareness of the torture before it occurs and "thereafter breach his or her legal responsibility to intervene to prevent [it]." *Id.* § 208.18(a)(7). Evidence relevant to assessing Lopez-Diaz's eligibility for relief requires consideration of whether she had been tortured in El Salvador, her ability to relocate within the country, and relevant country conditions. *Id.* § 208.16(c)(3).

10

Substantial evidence supports the finding that Lopez-Diaz will not likely be tortured if removed to El Salvador. Lopez-Diaz provided no evidence of past torture, and her evidence reflected that the government had not acquiesced in the criminal activities of the MS-13 gang. Local authorities prepared a criminal complaint that documented the extortion and threats that Lopez-Diaz reported, but because Lopez-Diaz left El Salvador immediately, she was unaware whether police had caught any of the culprits. Although country reports reflect that the government has been unsuccessful in quelling gang criminal activities and violence, the reports do not suggest that the government would acquiesce in any torture that gangs might inflict on Lopez-Diaz. *See Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004). Moreover, relocation is a viable option for Lopez-Diaz. Lopez-Diaz testified that, after leaving her hometown, she lived in the capital city of El Salvador for several days without incident.

## IV. CONCLUSION

We **DENY** Lopez-Diaz's petition for review.