[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13201

_____

Agency No. A088-711-937

MARIA BELEN PEREZ-ZENTENO,
GERARDO MELCHOR-PEREZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(January 25, 2019)

Before MARCUS, NEWSOM and EBEL,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by
designation.

The central question raised in this immigration appeal is whether the Petitioners are entitled to asylum on account of being members of a "particular social group" as defined in the Immigration and Nationality Act (INA). Maria Perez-Zenteno ("Perez-Zenteno") and her son (Gerardo Melchor Perez) seek review of a Board of Immigration Appeals (BIA) decision denying their requests for asylum, withholding of removal, and humanitarian asylum. They claim entitlement to asylum because they were persecuted in Mexico on account of membership in a "particular social group," which they defined as all "Mexican citizens targeted by criminal groups because they have been in the United States and they have families in the United States." The Immigration Judge (IJ) denied relief because, although Perez-Zenteno was beaten and brutally raped and her daughter kidnapped, she failed to prove that she was persecuted on account of membership in a statutorily protected group. The social group offered was neither sufficiently particular nor socially distinct. What's more, the IJ determined Perez-Zenteno failed to establish any nexus between the persecution she suffered and the statutory grounds asserted. The BIA agreed. Because we too agree that Perez-Zenteno has failed to establish membership in a particular social group, as defined by Congress, and because no nexus has been shown, we hold that the petition must be denied.

2

I.

Maria Perez-Zenteno is a native and citizen of Mexico, from the village of Tzitzio in the state of Michoacán. In 2015, she applied for admission to the United States. On November 10, 2015, the Department of Homeland Security commenced removal proceedings against Perez-Zenteno and her son by filing Notices to Appear, charging them with inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i)(I) because they lacked valid entry documents. The Petitioners appeared before an IJ, represented by counsel. They admitted to the allegations and conceded the inadmissibility charges. However, Perez-Zenteno sought asylum, withholding of removal, and relief under the Convention Against Torture on the ground that she suffered past persecution at the hands of Mexican criminals based on her membership in a particular social group: "Mexican citizens targeted by criminal groups because they have been in the United States and they have families in the United States."[1]

---

[1] Both the BIA and the Immigration Judge at various points defined the proffered group as "Mexican citizens targeted by criminal groups because they have been in the United States and have families in the United States, and who are unable to get protection from their government." This additional language simply duplicates the statutory language defining a refugee as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). Thus, we read the proposed social group as being "Mexican citizens targeted by criminal groups because they have been in the United States and have families in the United States."

3

At an evidentiary hearing conducted by the IJ, Perez-Zenteno claimed that she first came to the United States in 1995 as an eleven-year-old child after her father was killed in Mexico. She stayed for two years and returned to Mexico fearing sexual abuse at the hands of her uncle in the United States. In 2001, she returned to the United States with her husband and young son. They had three more children, all born in Florida, before Perez-Zenteno and her children returned to Mexico in 2007 because her mother became ill. The only family Perez-Zenteno specifically identified as being in the United States after she left was her husband, who continued working at a construction job in Florida.

Perez-Zenteno further testified that in April 2013, while she and her children were living in Mexico, her five-year-old daughter was kidnapped from a supermarket. The kidnappers demanded a ransom of 150,000 pesos. When Perez-Zenteno delivered the ransom, she was abducted, driven outside of town, beaten, and raped. Perez-Zenteno also was threatened, warned not to tell anyone of her attack, and released, to find her daughter returned to her sister's home unharmed. A neighbor then offered to provide protection for 1,000 pesos per month, which Perez-Zenteno paid for approximately a year until she became suspicious that her neighbor was involved in the kidnapping plot. Perez-Zenteno eventually called the police, who discovered a kidnapped man in her neighbor's home, and arrested the neighbor in October 2014. In March 2015, after receiving a phone call threatening

4

her for being a "snitch," Perez-Zenteno fled along with her children to the United States.

The IJ denied the Petitioners' application, concluding that Perez-Zenteno had failed to establish she was the victim of past persecution on account of any statutory ground for asylum, including membership in a cognizable social group. The IJ likewise concluded that Perez-Zenteno had not established a well-founded fear of future persecution on account of any statutorily protected ground, including membership in a particular social group. Although the Immigration Judge found Perez-Zenteno credible as to her rape and fear of returning to Mexico, the IJ concluded that Perez-Zenteno's proposed social group -- "Mexican citizens targeted by criminal groups because they have been in the United States and they have families in the United States" -- was not cognizable under the INA. The IJ found that although the group might be based on an immutable characteristic -- after all, one cannot change the past experience of having been in the United States or having family in the United States -- the group was defined with insufficient particularity and was not socially distinct. Consequently, the IJ denied Perez-Zenteno's application for asylum and withholding of removal.

Perez-Zenteno appealed to the BIA. In a two-page, non-precedential decision, a single member of the BIA affirmed the IJ's decision. The BIA agreed that Perez-Zenteno had failed to establish that she was targeted on account of

5

membership in a particular social group.  The BIA said that "even if the factors of immutability and particularity were met, the respondents did not establish that their claimed group is viewed as socially distinct within Mexican society" and that "the group is impermissibly circularly defined by the harm directed at its members."  In support of its determination, the BIA cited to its opinion in Matter of A–M–E– & J–G–U–, 24 I. & N. Dec. 69 (BIA 2007), a precedential panel decision that had found that wealthy Guatemalans did not constitute a cognizable social group.  The BIA also concluded that the IJ's factual finding that Perez-Zenteno failed to establish a nexus between her persecution and a statutorily protected ground was not clearly erroneous.

Perez-Zenteno seeks review in our Court of the denial of asylum, withholding of removal, and humanitarian asylum.

## II.

We review the BIA's decision as the final judgment, unless the BIA expressly adopted the IJ's opinion.  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009).  When the BIA agrees with the IJ's reasoning, we review the decisions of both the BIA and the IJ.  Id.  Here, because the BIA agreed with the findings of the IJ and added its own observations, we review both. Moreover, we review all legal conclusions de novo, Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001), including whether a group proffered by an

6

asylum applicant constitutes a particular social group under the INA, Malu v. U.S. Att'y Gen., 764 F.3d 1282, 1286, 1290 (11th Cir. 2014).

As we have previously held, this de novo review is further informed by the principles of deference set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  See Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1195 (11th Cir. 2006).  Under Chevron, "[w]hen a court reviews an agency's construction of the statute which it administers . . . [and] the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 842–43.  If so, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator or agency."  Id. at 844.

We also review findings of fact under the substantial-evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).  Accordingly, we must affirm the BIA's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004) (quotation omitted).  "To reverse the . . . fact findings, [the Court] must find that the record not only supports

7

reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). "That is, even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision." Adefemi, 386 F.3d at 1029.

III.

Under the Immigration and Nationality Act, the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien . . . if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1). The INA, in turn, defines "a refugee" as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). Plainly, an asylum applicant bears the burden of establishing "refugee" status, 8 C.F.R. § 208.13(a), so she must present "specific, credible evidence" demonstrating either past persecution on account of a statutorily protected ground, or a well-founded fear of future persecution on account of a statutorily protected

8

ground, 8 C.F.R. § 208.13(b).  See also Al Najjar, 257 F.3d at 1287.  And to satisfy

the "on account of a statutorily protected ground" requirement, the applicant must

prove that the protected ground "was or will be at least one central reason for

persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i).

## A.

Here, the IJ and the BIA agreed that Perez-Zenteno failed to demonstrate

that "Mexican citizens targeted by criminal groups because they have been in the

United States and they have families in the United States" were viewed as a

socially distinct group in Mexico and that the group was not defined with sufficient

particularity.

The antecedent question we confront is the level of deference to afford the

BIA's determination.  Our law is clear that we defer to reasonable interpretations

of the ambiguous statutory phrase "particular social group" set forth in

precedential, three-member BIA decisions, including Matter of Acosta, 19 I. & N.

Dec. 211 (BIA 1985) and its progeny.  See Gonzalez v. U.S. Att'y Gen., 820 F.3d

399, 404 (11th Cir. 2016) ("We have previously held that the BIA's interpretation

of the phrase 'particular social group' in 8 U.S.C. § 1231(b)(3)(A) is entitled to

Chevron deference because the INA does not define the phrase and it is

ambiguous.") (citing Castillo-Arias, 446 F.3d at 1196); see also I.N.S. v. Aguirre-

Aguirre, 526 U.S. 415, 424–25 (1999) (noting that "[i]t is clear that principles of

9

Chevron deference are applicable to [the INA] statutory scheme" and that "the BIA should be accorded Chevron deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication'") (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 448–49 (1987)).

But the general principle that the BIA is entitled to deference in interpreting the meaning of "a particular social group" is not the end of the story. Two years after Castillo-Arias, a panel of this Court adopted the view expressed by the Second and Ninth Circuits that single-member, non-precedential BIA decisions -- like the one before us now -- may not be entitled to any deference. Quinchia v. U.S. Att'y Gen., 552 F.3d 1255, 1258 (11th Cir. 2008). That is, while the Acosta framework is entitled to deference, a single-member application of that framework to a particular case may not be. The Second and Ninth Circuits had narrowed Chevron deference because the Supreme Court had done so in United States v. Mead Corp., 533 U.S. 218 (2001). See Garcia-Quintero v. Gonzales, 455 F.3d 1006 (9th Cir. 2006); Rotimi v. Gonzales, 473 F.3d 55 (2d Cir. 2007). In Garcia-Quintero, the Ninth Circuit cited to Mead and held "that Chevron deference applies only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" Id. at 1012 (quoting Mead, 533 U.S. at 226–27) (emphasis added in original); see also id. (noting that

10

"[i]n light of Mead, the 'essential factor' in determining whether an agency action warrants Chevron deference is its precedential value" (quoting Miranda Alvarado v. Gonzales, 449 F.3d 915, 922 (9th Cir. 2006))).  Relying on BIA regulations and the BIA's Practice Manual, the Ninth Circuit found that only three-member panel, published BIA decisions may serve as precedents, and thus only those decisions are interpretations promulgated in the exercise of its delegated authority.  Id. at 1012–13 (citing 8 C.F.R. § 1003.1; BIA Prac. Man., Ch. 1.3(a)(i) (rev. 6/15/2014)[2]).

In Rotimi, the Second Circuit similarly applied Mead and declined to afford Chevron deference to a single-member BIA decision interpreting the phrase "lawfully resided continually" for purposes of a § 212(h) waiver.  Rotimi, 473 F.3d at 57 ("Because there is no indication that the BIA's nonprecedential single-member decision was 'promulgated' under its authority to 'make rules carrying the force of law,' we do not accord it Chevron deference.") (citation omitted).

It is not at all clear that we are obliged to afford deference directly to the single-member decision in this case.  As a panel of this Court recently observed, pursuant to Quinchia "a single-member Board decision should be deemed to have 'rel[ied] on' existing precedent for Chevron purposes only where it is actually

---

[2] The BIA Practice Manual, last revised in October 2018, has remained unchanged as to the provisions cited by the Ninth Circuit in Garcia-Quintero.  See BIA Prac. Man., Ch. 1.3 (rev. 10/16/2018).

11

dictated -- or 'compelled' -- by an earlier decision." Barton v. U.S. Att'y Gen., 904 F.3d 1294, 1302 n.5 (11th Cir. 2018).  And it is not clear to us whether the single-member, nonprecedential decision in this case was compelled by the earlier precedential decisions in Matter of M–E–V–G–, 26 I. & N. Dec. 227 (BIA 2014), Matter of W–G–R–, 26 I. & N. Dec. 208 (BIA 2014), and Matter of A–M–E– & J–G–U–, 24 I. & N. Dec. 69 (BIA 2007).  We need not ultimately decide the question, however, because the result would be the same whether we afford Chevron deference directly to this single-member decision, only to the Acosta framework generally, or not at all.  Under any analysis, whether deferential or de novo, the proffered group -- "Mexican citizens targeted by criminal groups because they have been in the United States and they have families in the United States" -- is not legally cognizable as a particular social group.

## B.

Affording Chevron deference to the BIA's determination in this case, we are satisfied that the Petitioners' claims to asylum must be denied.

The IJ determined and the BIA agreed that Perez-Zenteno failed to establish that she was targeted on account of membership in a particular social group. Although the IJ found her to be a credible witness, the IJ concluded that the proffered social group was not cognizable under the INA.  The BIA agreed, ruling that "even if the factors of immutability and particularity were met, the respondents

12

did not establish that their claimed group is viewed as socially distinct within Mexican society," and that "the group is impermissibly circularly defined by the harm directed at its members."

In Matter of Acosta, the BIA had first interpreted the phrase "particular social group" to mean "a group of persons all of whom share a common, immutable characteristic." Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985), overruled on other grounds, Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987). The shared characteristic uniting the social group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Id. In a series of precedential decisions, the BIA has elaborated that a particular social group also must be "defined with particularity" and be "socially distinct within the society in question." Matter of M–E–V–G–, 26 I. & N. Dec. 227, 237 (BIA 2014). Regarding particularity, the BIA has said that "[t]he [proposed] group must . . . be discrete and have definable boundaries -- it must not be amorphous, overbroad, diffuse, or subjective." Matter of W–G–R–, 26 I. & N. Dec. at 214; see also Gonzalez, 820 F.3d at 404–05 (deferring to Matter of W–G–R–). Relatedly, the social distinction requirement asks "whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way" -- that is, "[a] viable particular social group should be

13

perceived within the given society as a sufficiently distinct group."  Matter of M–E–V–G–, 26 I. & N. Dec. at 238 (emphasis added).  "The members of a particular social group will generally understand their own affiliation with the grouping, as will other people in the particular society."  Id.

The IJ and the BIA reasonably applied these precedents to this case and concluded that Perez-Zenteno had failed to establish that her proffered group was either socially distinct or defined with sufficient particularity.  Perez-Zenteno failed to present any evidence even suggesting that the particular social group she had proffered was perceived as being socially distinct in Mexico.  Castillo-Arias, 446 F.3d at 1194 (explaining that a proposed social group has "social visibility" -- the criteria later renamed to "social distinction" -- if it is bound by "characteristics which were highly visible and recognizable by others in the country in question").  In response, Perez-Zenteno simply cited three pages drawn from the 2015 State Department Human Rights Report.  But that Report does not support her claim that the social group was socially visible or distinct.  The State Department had only indicated, and on a general level at that, that "[o]rganized criminal groups killed, kidnapped, and intimidated citizens, migrants, journalists, and human rights defenders."

Indeed, to the extent the Report made any reference to any group that even arguably could be characterized as discrete, the Report simply identified prisoners,

14

human rights activists, journalists, women, people with disabilities, indigenous people, members of the LGBT community, and children forced into labor.  In no way does the Report support the idea that Mexican citizens who traveled to the United States and who had family members who lived in the United States somehow were socially distinct or uniquely targeted for abuse.  The Report observed that kidnapping -- the persecution suffered by Perez-Zenteno's daughter -- "remain[s] a serious problem for persons at <u>all</u> socioeconomic levels."  Perez-Zenteno has cited to no evidence supporting the idea that "Mexican citizens targeted by criminal groups because they have been in the United States and have families in the United States" are recognized as a socially distinct group.

The IJ and BIA also reasonably determined that Petitioners failed to meet the particularity requirement because the social group they proffered lacked any definable boundaries and actually encompassed a very large percentage of the Mexican population.  Finally, the BIA reasonably determined that the Petitioners' formulation was impermissibly circular.  "Mexican citizens <u>targeted by</u> criminal groups because they have been in the United States and have families in the United States" do not comprise a particular social group because its defining attribute is the risk of persecution stemming from being targeted by criminal groups.  <u>Rodriguez</u>, 735 F.3d at 1310.  The proffered social group is defined in large

15

measure by the risk of persecution.  The IJ and BIA determinations were reasonable and -- on the assumption that Chevron applies -- entitled to deference.

## IV.

Even if we were to conclude, however, that the IJ and BIA's determinations are not entitled to deference because the ruling was made by a single member of the Board and went substantially beyond its precedential holdings, we would still reach the same conclusion ourselves, and even in the absence of the Acosta framework at that.  On any reading of the statute, Perez-Zenteno's proffered definition does not constitute a particular social group.

The phrase "particular social group" was enacted into American law in the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102 (1980).  The phrase originated in the United Nations Protocol Relating to the Status of Refugees, done January 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 ("UN Protocol"), which was ratified by the United States in October 1968, 114 Cong. Rec. 29,607 (1968).  The Protocol defined "refugee" as "any person who . . . owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country."  UN Protocol, art. I.  The Refugee Act adopted this definition wholesale.

16

Any analysis of the statutory term "a particular social group" necessarily begins with the text. See King v. Burwell, 135 S. Ct. 2480, 2489 (2015). While the phrase "particular social group" is not altogether illuminating, there are some guideposts to be drawn from this language. A "group" is "a number of individuals bound together by a community of interest, purpose or function as a class." Group, Webster's Third New International Dictionary (1966). A "class" means a "society-wide grouping of people according to social status, political or economic similarities, or interests or ways of life in common." Class, Webster's Third New International Dictionary (1966). Thus, the phrase "social group" implies a subset of the population bound together by some discrete and palpable characteristics.

The addition of the modifier "particular" suggests some narrowing from the breadth otherwise found in the term "social group." "Particular" means "of, relating to, or being a single definite person or thing as distinguished from some or all others." Particular, Webster's Third New International Dictionary (1966). Thus, a particular social group denotes some characteristic setting the group off in a definite way from the vast majority of society; indeed, "particular" must meaningfully narrow the possibilities or it would be mere surplusage and redundant of the word "group." These limited textual clues, then, tell us that a particular social group must be defined more narrowly.

17

In Castillo-Arias, we explained that a "'particular social group' should not be a 'catch all' for all persons alleging persecution who do not fit elsewhere. In restricting the grounds for asylum and withholding of deportation based on persecution to five enumerated grounds, Congress could not have intended that all individuals seeking this relief would qualify in some form by defining their own 'particular social group.'" Castillo-Arias, 446 F.3d at 1198. Based on the plain language of the statute, its logic, and common sense, we agree with the BIA that a "particular social group" must be more narrowly defined. Like the BIA, we turn to such obvious, discrete and measurable factors as immutability, identity, visibility, homogeneity, and cohesiveness in order to give meaning to the term. See Donchev v. Mukasey, 553 F.3d 1206, 1220 (9th Cir. 2009).

As we see it, any reasonable application of this statute necessarily yields the conclusion that the proffered group is drawn far too broadly to qualify as a particular social group under the INA. The demographic group proposed is sweeping in its breadth and not easily cabined by any obvious guidepost or limiting principle. It is extraordinarily numerous, but we don't even know how large because the Petitioners have not told us, and the group is wholly amorphous because they have filled in none of the blanks. Undeniably, large numbers of Mexican citizens have visited the United States, perhaps numbering in the millions.

18

And many Mexican citizens live in the United States, also perhaps numbering in the millions.

Perez-Zenteno has done nothing to limit or circumscribe this large and diverse group in any way.  Indeed, although we know that Perez-Zenteno lived in the United States for roughly eight years, her proposed definition also would encompass Mexican citizens who have only visited the United States, so long as they also have a family member residing in America.  What's more, having "family" in the United States is likewise impermissibly unclear.  We cannot tell from anything Perez-Zenteno has told us whether it includes only immediate family members or indeed extends to far more distant familial relations.

Some basic demographic figures illustrate the potential scope of this group. As of 2016, more than 11 million United States residents were born in Mexico. Pew Research Center, Facts on U.S. Immigrants, 2016 (2018), available at http:// www.pewhispanic.org/2018/09/14/facts-on-u-s-immigrants-current-data.  Each of those Mexico-born United States residents likely has a number of family members or indeed extended family members still living in Mexico.  And the  total population of Mexico as of 2017 was just over 123 million.  See UN Statistics Division, United Nations Demographic Yearbook (2017), https://unstats.un.org/unsd/demographic-social/products/dyb/dyb_2017 (estimating the population of Mexico in 2017 as 123,518,000).  Thus, the number of Mexican

19

citizens living in Mexico who "have family in the United States" likely constitutes a significant percentage of the total population of Mexico.

Put simply, the Petitioners' proffered social group is amorphous, insufficiently defined, and potentially encompasses a very large number of people who live in Mexico. The Petitioners have failed to come close to meeting their burden of establishing a particular social group that is either immutable, identical, visible, homogeneous, or cohesive. Accordingly, we deny Perez-Zenteno's petition seeking asylum, withholding of removal, and humanitarian asylum.[3]

---

[3] At the end of her Blue Brief filed in this Court, Perez-Zenteno suggests that she need not show membership in a particular social group in order to be granted humanitarian asylum. An applicant, who establishes that she is a refugee, may qualify for asylum even when the government has rebutted the presumption of a well-founded fear of future persecution if: (1) "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or (2) "[t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii). This provision describes what we have referred to as "humanitarian asylum." Mehmeti v. U.S. Att'y Gen., 572 F.3d 1196, 1200 (11th Cir. 2009). But notably, in order to be granted humanitarian asylum, the applicant must still establish that she is a refugee, which necessarily requires a showing of persecution on account of a statutorily protected ground. See 8 C.F.R. § 1208.13(b)(1)(iii). Unlike the normal asylum process, humanitarian asylum allows an applicant to be granted asylum when her well-founded fear of future persecution is rebutted by the government, or non-existent, or the applicant will be subjected to some other harm not associated with the already-established past persecution. That is the only difference between normal asylum applicants and humanitarian asylum applicants. Contrary to Perez-Zenteno's suggestion, humanitarian asylum does not allow an applicant to receive asylum based on persecution unconnected to any statutorily protected ground. She still must establish that she is a refugee, which requires a showing of past persecution on account of a statutorily protected ground. See 8 C.F.R. § 1208.13(b)(1)(iii). Thus, our analysis concerning membership in a cognizable social group also forecloses her claim to humanitarian asylum.

20

V.

Although the IJ largely focused its opinion on the Petitioners' failure to define a "particular social group," the IJ also suggested -- and the BIA found that the IJ determined -- that Perez-Zenteno failed to establish a nexus between the persecution suffered, the persecution she claims she will suffer, and any other statutorily protected grounds for asylum. The determination of a persecutor's motive when considering whether an alien is eligible for asylum is essentially factfinding. See Sealed Petitioner v. Sealed Respondent, 829 F.3d 379, 384 (5th Cir. 2016). The BIA found no clear error in the IJ's factual determination, and it affirmed on that basis as well.[4]

We agree with the BIA that even if the Petitioners had properly formulated a "particular social group" -- and on this record they haven't come close to meeting their burden -- their claims still would fail because the record does not support, let alone compel reversal of the IJ's finding that Perez-Zenteno did not demonstrate a nexus between persecution and membership in the proffered group. See Mendoza, 327 F.3d at 1287. Perez-Zenteno has not established she was targeted for persecution on account of her ties to the United States.

---

[4] The BIA did so in a footnote. The IJ found that Perez-Zenteno had "failed to establish a nexus between the persecution that she suffered and the persecution that she fears she will suffer, and any of the statutory grounds for asylum." While it is possible to read from the context of that statement that the IJ was simply referring to the Petitioners' failure to allege a cognizable particular social group, we believe it was reasonable for the BIA to determine that the IJ had made a factual finding on this separate matter too.

21

We can identify only two pieces of record evidence that even arguably support a finding of nexus.  In her supplemental statement before the evidentiary hearing, Perez-Zenteno claimed that her assailants "told [her] that they knew the identities of [her] children and that [her] husband was in the US."  During the hearing, the government's lawyer asked Perez-Zenteno whether she was considered in Mexico to have money because she had just come back from the United States and had a husband who lived in the United States.  She simply answered in the affirmative.  Perez-Zenteno offered no other evidence, testimonial or otherwise, that remotely suggested she was targeted because she had once lived in the United States or because her husband continued to do so.  The long and short of it is that the failure to adequately controvert the nexus finding by the IJ provides an independent basis for affirming the BIA's determination and denying the petition.

Thus, on this record, the petition for asylum, withholding of removal, and humanitarian asylum must be denied.

**PETITION DENIED.**