[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13290

_____

Agency No. A075-168-471

TOMMY MARTINEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 17, 2020)

Before BRANCH and MARCUS, Circuit Judges, and HUCK,[*] District Judge.

PER CURIAM:

Tommy Martinez, a native and citizen of Guatemala, seeks review of the

Board of Immigration Appeals' ("BIA") final order that dismissed his appeal from

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida,
sitting by designation.

the Immigration Judge's ("IJ") denial of his application for deferral of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85.  He argues that the IJ and BIA erred in concluding that he was ineligible for CAT relief.  After thorough review of the record and oral argument, we deny the petition for review.

We review only the BIA's decision as the final agency decision, unless it expressly adopted the IJ's opinion or agreed with the IJ's reasoning.  Perez-Zenteno v. U.S. Att'y Gen., 913 F.3d 1301, 1306 (11th Cir. 2019).  If the BIA adopted or agreed with the reasoning of the IJ's decision, we review both decisions.  Id.

We lack jurisdiction to review any final order of removal against an alien, like Martinez, who is removable by reason of having committed a criminal offense covered in 8 U.S.C. § 1227(a)(2)(A)(iii), unless the alien raises constitutional claims or questions of law.  8 U.S.C. §§ 1252(a)(2)(C) and (D).  When we face a petition for review of an order denying a CAT claim from a petitioner like Martinez, we cannot review the administrative fact findings of the IJ or the BIA as to the sufficiency of the alien's evidence or the likelihood that the alien will be tortured if returned to the country in question.  Singh v. U.S. Atty. Gen., 561 F.3d 1275, 1280 (11th Cir. 2009).  However, whether a particular undisputed fact

2

pattern amounts to torture as a matter of law "requires a court to apply a legal definition to a set of undisputed or adjudicated historical facts" and is a "question of law" within the meaning of the statute. Id. (quotations omitted). Thus, we retain jurisdiction to review the BIA's legal conclusion that Martinez had not established torture under CAT. Id.

Under the Immigration and Nationality Act ("INA"), we "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). We lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted all administrative remedies related to that claim. Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006). Accordingly, if the petitioner has not raised an issue before the BIA, we lack jurisdiction over it. See id. We do not consider issues that were not reached by the BIA. Gonzalez v. U.S. Att'y Gen., 820 F.3d 399, 403 (11th Cir. 2016). Additionally, when an appellant fails to offer argument on an issue in his appellate brief, that issue is abandoned. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

CAT was "the product of a long-evolving international consensus against torture committed by official actors." United States v. Belfast, 611 F.3d 783, 801 (11th Cir. 2010). It provides, in relevant part, that "[n]o State Party shall expel, return . . . or extradite a person to another State where there are substantial grounds

for believing that he would be in danger of being subjected to torture." CAT art. 3, § 1. Unlike asylum relief, which is discretionary, withholding of removal and relief under CAT, where warranted, is mandatory. See 8 C.F.R. § 208.16(c).

To establish eligibility under CAT and its implementing regulations, the alien bears the burden of proof to establish that it is more likely than not that he would be tortured if removed to the proposed country of removal. 8 C.F.R. § 208.16(c)(2); Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). Torture is "an extreme form of cruel and inhuman treatment" and is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1), (2). To constitute torture, the actor must specifically intend to cause severe physical pain or suffering or threaten the alien with imminent death or severe pain and suffering. See id. § 208.18(a)(4). Any act that results in "unanticipated or unintended severity of pain and suffering is not torture." Id. § 208.18(a)(5). To obtain CAT relief, the alien must demonstrate that

4

the torture would be inflicted by the government or that the government was aware of the torture and failed to intervene. Reyes-Sanchez, 369 F.3d at 1242.

Tommy Martinez is a native and citizen of Guatemala who was ordered removed from the United States in 2009 following multiple forgery-related criminal convictions. According to the record, which is based largely on testimony from Martinez that the IJ deemed credible, Martinez was approached on his second day back in Guatemala by MS-18 ("Maras") gang members, a widespread gang in Guatemala, who requested that he pay a $5,000 tax. Rather than responding to this demand, Martinez "ran back to [his] aunt's and uncle and told them what had happened and immediately [his] uncle told [him] that he had to get [Martinez] out of there." Martinez did not call the police or otherwise report this incident to Guatemalan authorities. His uncle then took him to a house of his uncle's in Palencia, "about 45 [minutes] to one hour away" from where he was approached, where Martinez lived without incident for about six months.

In December 2009, while he was still in Palencia, Martinez borrowed his uncle's truck and was stopped by the police. Two police officers interrogated Martinez about the payment he had yet to make and struck the back of his head with a pistol. Martinez recalled the Maras gang that had demanded he pay a tax upon his return to Guatemala, but he did not know how the gang and the police were connected and could not explain it.

5

Martinez then fled over the border to Mexico where he remained for several months before he returned to Guatemala because his grandmother was ill. At some point during his bus trip back to Guatemala, Martinez "had a seizure in the bus or getting to the bus, . . . and [he] was taken to the hospital and woke up three days later." Martinez was told that he'd "had a seizure" from "a hit [he'd received on the bus] directly to the back of [his] head," which caused a hydrocephalus condition he'd had since birth to worsen, requiring the hospital to place a shunt in his brain. Martinez did not know who attacked him on the bus.

Upon getting "the go-ahead from the doctors" at the hospital in Guatemala, Martinez returned to Mexico, where he remained from June 2011 until March 2012, when he returned to the United States without authorization. Within two weeks of his return to the United States, his uncle, who had protected him during his time in Guatemala, was murdered. Martinez did not specify who killed his uncle but said that a week before the murder, "the Maras and the police" had visited his uncle about Martinez's unpaid debt. Martinez also told the IJ that his aunt Lorena, her husband, and their two children had been beheaded "by the Maras and the cops" in 2006. In addition, two other family members "directly related to [his] mother" were shot and killed in 2008, but Martinez did not know the details.

After taking Martinez's testimony, the IJ issued a written report denying Martinez relief under CAT. The IJ determined that the past harm that Martinez

had experienced was not severe enough to constitute torture, because he was attacked by the police on only one occasion and, as for the bus attack, there was no evidence in the record suggesting how he was attacked or by whom.  The IJ acknowledged that Martinez's hydrocephalus might result in severe pain for him but found no evidence that his attackers knew of his condition or that hitting him in the head would cause him serious injury.  The IJ further determined that the harm that was suffered by his family did not demonstrate that Martinez would more likely than not be tortured upon his return to Guatemala because nothing he submitted indicated that the individuals who murdered his family were affiliated with the individuals who instructed him to pay the tax, the police officers who hit him with a gun, or the individuals who attacked him on the bus.

The IJ also took administrative notice of the 2016 Guatemalan Human Rights Report ("Country Report"), which provided that criminal activity, gang violence, and police corruption were widespread in Guatemala.  The IJ concluded that Martinez and his family did not suffer from a higher incidence of violence than did the rest of the population, and that Martinez had failed to demonstrate that the government had acquiesced to his torture.  The IJ thus found that Martinez had not shown -- in the absence of past torture -- that he would more likely than not face officially sanctioned torture upon his return to Guatemala.

Martinez appealed to the BIA, but it dismissed his appeal, agreeing with the IJ that he was ineligible for deferral of removal under CAT. As for the police officers' attack, the BIA held that it was not torture because Martinez did not lose consciousness and he did not testify that he needed medical attention. As for the bus attack, which Martinez had not cited as evidence of torture to the BIA, the BIA determined that the incident was not torture because Martinez did not know who struck him or for what reason. The BIA "acknowledge[d] that [Martinez's] hydrocephalus increased the severity of the injuries," but found that the immigration judge "did not clearly err in finding that the attackers were unaware of this condition." The BIA also concluded that his family members' murders did not demonstrate that he had a probability of future torture because the record did not establish that the incidents were related. The BIA added that the IJ had not clearly erred in rejecting Martinez's argument that the police officers who struck him were cooperating with the gangs, noting that the police and gang members were from different zones.[1] Following the BIA's dismissal of his appeal, Martinez filed a timely petition for review in this Court.

As a matter of law, on the record presented to this Court, we cannot say that Martinez's treatment in Guatemala constituted torture under CAT. Martinez does

---

[1] Because Martinez had not shown a probability of future torture, the BIA declined to address the IJ's "finding that a public official would not acquiesce to any torture." fAnd because the BIA did not consider it, we will not reach that argument either. Gonzalez, 820 F.3d at 403.

8

not challenge the agency's finding that he "did not lose consciousness and did not testify that he needed medical attention" after he was hit in the head with a gun. Rather, Martinez argues that his medical condition, hydrocephalus -- which would potentially make Martinez more sensitive than the average person to being hit in the head -- would elevate whatever harm he suffered to constitute torture.  While Martinez has demonstrated that he does, in fact, have hydrocephalus and that he likely would experience elevated pain in the event of an attack, standing alone, those undisputed facts do not amount to torture as a matter of law under CAT.

To constitute torture, which is defined as "an extreme form of cruel and inhuman treatment," the actor must specifically intend to cause severe physical pain or suffering or threaten the alien with imminent death or severe pain and suffering.  See 8 C.F.R. § 208.18(a)(2), (4).  Any act that results in "unanticipated or unintended severity of pain and suffering is not torture."  Id. § 208.18(a)(5). Martinez's injury, even when aggravated by his hydrocephalus condition, does not constitute torture under CAT because his elevated pain and suffering was "unanticipated or unintended," and, notably, he did not show that his attackers were aware of his condition.  While Martinez contends that "the shunts that have been permanently implanted in his head are easily visible to the naked eye," this was not the case at the time of the incidents in Guatemala, nor has he shown anything more than speculation that the visible shunts "could" lead to torture in the

9

future. Id.[2] Based on the undisputed record, we cannot sat that the BIA erred as a matter of law when it found that Martinez failed to establish that he more likely than not would be tortured.

Moreover, even if the police incident was considered cumulatively with the evidence of the Country Report and the murder of Martinez's uncle, the BIA did not legally err in concluding that Martinez failed to establish torture as a matter of law under CAT. Although the Country Report indicates that police officers were often involved in unlawful killings, mistreatment, and extortion, Martinez did not produce any evidence suggesting that he would be singled out and targeted upon his return to Guatemala -- more so than would any other member of the population -- or that he otherwise would be likely to experience torture in Guatemala. See 8 C.F.R. § 208.18(a)(1), (5) (defining torture as an act that is "specifically intended" to inflict severe pain or suffering for a proscribed purpose, including "for any reason based on discrimination of any kind"); see also Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1324 (11th Cir. 2007) (noting that CAT relief is not warranted where "petitioners . . . could not establish that they would be

---

[2] Martinez has abandoned any claim that the bus attack constituted torture this claim by not raising the argument on appeal to this Court, Sepulveda, 401 F.3d at 1228 n.2 -- as his lawyer explained at oral argument, Martinez is not relying on the bus attack because he could not say who perpetrated it.

individually and intentionally singled out for harsh treatment") (emphasis in original).

Martinez's testimony about his uncle's murder, and the murders of other family members, unfortunately gets him no further.  Other than general information about the murders and imprecise testimony that the murders were committed by "them" or "the Maras and the police," Martinez offered nothing specific to link his family members' murders with the people who threatened him in Guatemala.    Accordingly, we deny the petition.[3]

**PETITION DENIED.**

---

[3] To the extent Martinez asks us to review any factual findings underlying the BIA's conclusion that he failed to establish more likely than not that he would be tortured, we cannot.  Singh, 561 F.3d at 1280 ("[W]e may not review the administrative fact findings of the IJ or the BIA as to the sufficiency of the alien's evidence and the likelihood that the alien will be tortured if returned to the country in question.").