[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-10599
Non-Argument Calendar
_____

Agency No. A206-702-149

IVEZETH C. VELASQUEZ ALVARADO,
a.k.a. Carolina Velasquez Alvarado,
KENSY Y. MARTINEZ VELASQUEZ,
SINDY C. MARTINEZ VELASQUEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(October 9, 2020)

Before JORDAN, NEWSOM and HULL, Circuit Judges.

PER CURIAM:

Ivezeth C. Velasquez Alvarado ("Alvarado") and her two daughters[1] petition for review of the Board of Immigration Appeals's ("BIA") decision affirming the Immigration Judge's ("IJ") denial of their applications for asylum.[2]  In her counseled petition for review, Alvarado argues that the BIA erred in concluding that: (1) Alvarado's proposed particular social group of "Honduran women who are unable to leave a domestic relationship" was not cognizable under the Immigration and Nationality Act ("INA") § 208(b)(1), 8 U.S.C. § 1158(b)(1); (2) Alvarado's proposed alternate particular social group of "Honduran women who are viewed as property" was not cognizable under the INA; and (3) Alvarado was not eligible for humanitarian asylum.  After review, we deny the petition.

## I.  BACKGROUND

### A.    Asylum Applications

In May 2014, Alvarado and her daughters Kensy and Sindy—natives and citizens of Honduras—arrived at a port of entry at the Texas border seeking admission to the United States without a visa or entry document.  Alvarado

---

[1]Alvarado was the lead respondent in the immigration proceedings below, and her daughters Kensy Y. Martinez Velasquez ("Kensy") and Sindy C. Martinez Velasquez ("Sindy") were derivative applicants on Alvarado's asylum application as well as applicants in their own right.  For ease of reference, we refer to the petitioners collectively as Alvarado.

[2]While Alvarado also applied for withholding of removal and for protection under the Convention Against Torture, she explicitly abandoned appellate review of the BIA's and the IJ's denials of those applications.

2

expressed fear of returning to Honduras and underwent a credible fear interview,

after which she and her daughters were paroled into the United States.

In April 2015, Alvarado timely applied for asylum on her and her daughters'

behalf under the INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  In September 2016, the

Department of Homeland Security charged Alvarado with being removable as an

arriving alien not in possession of valid entry or travel documents under INA

§ 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), and initiated removal

proceedings.  Alvarado conceded removability.

In December 2016, Alvarado filed a second asylum application on her and

her daughters' behalf based in part on Alvarado's membership in a "particular

social group," without specifying the group.  Alvarado alleged that, before she

escaped to the United States, she had been in a "civil union" with Erick Menjivar,[3]

who subjected her to verbal, physical, and sexual abuse and threatened her and her

daughters.  Alvarado claimed that she was afraid to return to Honduras because

Menjivar had threatened to kill her and rape and kill her daughters.

In support, Alvarado attached her declaration, her psychological evaluation,

her credible fear interview, declarations of her neighbors, and photographs of the

scars she received from Menjivar's abuse.  These supporting materials

---

[3]Menjivar is not the father of Alvarado's daughters, and Alvarado was in a relationship with him for only approximately 15 months from February 2013 to May 2014.

demonstrated that: (1) Menjivar had verbally, physically, and sexually abused Alvarado; (2) Menjivar had threatened to hurt, kill, and/or sexually abuse Alvarado and her daughters; (3) Alvarado feared returning to Honduras because she believed Menjivar would find and kill her; and (4) Alvarado suffered from Post-Traumatic Stress Disorder because of Menjivar's threats and abuse.

Alvarado also attached various reports and expert affidavits on the conditions in Honduras. These materials established that Honduras had serious and pervasive problems with: violence against women; domestic violence; child abuse and sexual exploitation of children; rape; underreporting of spousal rape and domestic violence crimes due to fear, stigma, and lack of protective services; impunity for the perpetrators of violence against women and children; marginalization of and discrimination against women; violations of women's sexual and reproductive rights; and treating women and children as "property."

**B.    Hearing on Applications**

At a merits hearing, Alvarado's counsel informed that Alvardo was applying for asylum on the grounds that she suffered extreme persecution by Menjivar because of her membership in two particular social groups: (1) "a Honduran woman [who] was unable to leave a domestic relationship"; and (2) "a Honduran woman [who] was viewed as property."

In support, Alvarado testified to the verbal, physical, and sexual abuse she suffered while living with Menjivar in Honduras. Alvarado also said that Menjivar left marks on her body to demonstrate to others that she was his "property," prevented her from leaving the house except to go to work, and threatened to kill her and rape and kill her daughters if she left or disobeyed him. Alvarado tried to escape once and hide at her mother's house, but Menjivar found her and threatened to hurt her family if she did not return. When Menjivar actually attempted to rape one of Alvarado's daughters, she and her daughters finally escaped for good and fled to the United States. Alvarado said she never reported Menjivar to Honduran police because (1) he had hurt her with a knife when she tried to file a complaint against him before, (2) she knew he had previously killed two people, and (3) Menjivar said he was friends with the police and paid them off. She did not seek her family's help because they too were abusive towards her, were unsupportive of her, and also were afraid of Menjivar. Alvarado stated she feared that, if she returned to Honduras, Menjivar would kill her.

## C.    IJ Decision

Following the hearing, the IJ issued a written decision denying Alvarado's claim for asylum. The IJ concluded that Alvarado was not a credible witness because of various inconsistencies and because she did not sufficiently corroborate her claims. Alternatively, the IJ concluded that, even if Alvarado was credible, she

5

failed to meet her burden of proving statutory eligibility for asylum because the past persecution she suffered at the hands of Menjivar was not on account of her membership in a cognizable "particular social group" as required to qualify as a "refugee" under INA § 101(a)(42)(A).

The IJ concluded that Alvarado's first proposed social group, "Honduran women who are unable to leave a domestic relationship," was a cognizable social group, but Alvarado had not established that she was a member of that group because she was not in a "domestic relationship" with Menjivar.  The IJ concluded that Alvarado's second proposed social group, "Honduran women who are viewed as property," was not a cognizable social group because that group did not contain immutable characteristics, lacked particularity, and lacked social distinction.  The IJ also denied Alvarado's claim for humanitarian asylum because she had not demonstrated that she was a "refugee" under the INA.  Alvarado appealed to the BIA.

**D.    BIA Decision**

In a January 21, 2020 decision, the BIA affirmed the IJ's denial of asylum, albeit on different grounds.  The BIA declined to reach the IJ's adverse credibility determination but agreed with the IJ's alterative holding that, even if credible, Alvarado failed to prove her statutory eligibility for asylum.  The BIA disagreed with the IJ's assessment that Alvarado was not in a "domestic relationship" with

6

Menjivar.  Instead, the BIA concluded that "Honduran women [who are] unable to leave a domestic relationship" is not a cognizable particular social group.  The BIA explained that this proposed group was "impermissibly circularly defined by the fact that its members have been persecuted," citing the BIA's Matter of A-B-, 27 I. & N. Dec. 316 (AG 2018), and this Court's Amezcua-Preciado v. U.S. Att'y Gen., 943 F.3d 1337 (11th Cir. 2019).

The BIA agreed with the IJ's assessment that "Honduran women who are viewed as property" was not a cognizable group because it "lack[ed] the requisite particularity."  Seemingly, the group could encompass "woman of all ages, ethnicities, and social strata, who are in various types of relationships or no relationship at all" and it was unclear "what actions indicate a woman is viewed as property or who must view the woman as property."  Thus, Alvarado's abuse, while significant, lacked a nexus to a protected ground and thereby did not constitute past persecution or support eligibility for humanitarian asylum.  Accordingly, the BIA dismissed Alvarado's appeal.

## II.  STANDARD OF REVIEW

Generally, this Court reviews only the BIA's decision, except to the extent the BIA expressly adopted the IJ's opinion or agreed with the IJ's reasoning. Perez-Zenteno v. U.S. Att'y Gen., 913 F.3d 1301, 1306 (11th Cir. 2019).  The BIA's and IJ's factual findings are reviewed for substantial evidence and their

7

legal conclusions are reviewed de novo.  Mu Ying Wu v. U.S. Att'y Gen., 745

F.3d 1140, 1152 (11th Cir. 2014).  Whether a proffered group constitutes a

"particular social group" under the INA is a question of law.  Perez-Zenteno, 913

F.3d at 1306.

Here, the BIA rendered its own opinion and its own reasoning regarding

Alvarado's proposed social group of "Honduran women who are unable to leave a

domestic relationship," but agreed with the IJ's reasoning regarding both

Alvarado's alternatively proposed social group of "Honduran women who are

viewed as property" and her request for humanitarian asylum.  Thus, we review

only the BIA's decision as to the first social group and both the BIA's and IJ's

decisions as to the second social group and humanitarian asylum eligibility.

### III.  ASYLUM BASED ON MEMBERSHIP IN PARTICULAR SOCIAL GROUP: "HONDURAN WOMEN WHO ARE UNABLE TO LEAVE A DOMESTIC RELATIONSHIP"

### A.    Particular Social Group

An alien establishes asylum eligibility when she shows, with specific and

credible evidence, that she is a "refugee" because she either has suffered past

persecution or has a "well-founded fear" of future persecution based on one of the

statutorily listed factors.  Mu Ying Wu, 745 F.3d at 1155; see INA § 208.13(a),

(b); 8 U.S.C. § 1158(a)(1), (b)(1).  One such factor is the alien's "membership in a

particular social group."  INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  The

8

alien's membership in a particular social group must have been, or will be, "at least one central reason for persecuting the applicant." Amezcua-Preciado, 943 F.3d at 1342 (quotation marks omitted).  It is the asylum applicant's burden to establish her "refugee" status.  Id.

Because the INA itself does not define "particular social group," this Court has deferred to the agency's interpretation of that phrase and its "formulation of criteria for determining whether a particular social group qualifies."  Id. at 1342, 1344; Gonzalez v. U.S. Att'y Gen., 820 F.3d 399, 404 (11th Cir. 2016).  A "particular social group" must be: (1) composed of "a group of persons all of whom share a common, immutable characteristic"; (2) "defined with particularity"; and (3) "socially distinct within the society in question."  Perez-Zenteno, 913 F.3d at 1308-09 (quotation marks omitted); Matter of M-E-V-G-, 26 I. & N. Dec. 227, 237 (BIA 2014).

As to the first requirement, the common characteristic "must be immutable or fundamental to a member's individual conscience or identity," and, importantly for this case, that defining attribute must be independent of the persecution or risk of persecution alleged.  Amezcua-Preciado, 943 F.3d at 1342; Perez-Zenteno, 913 F.3d at 1308-09.  In other words, "[t]he group cannot be [circularly] defined by the persecution of its members, but rather 'the individuals in the group must share a narrowing characteristic other than their risk of being persecuted.'"  Amezcua-

9

Preciado, 943 F.3d at 1343 (quoting Matter of A-B-, 27 I. & N. Dec. at 335). This is so because, as this Court has cautioned, a particular social group "should not be a 'catch all' for persons alleging persecution who do not fit elsewhere" within the protected grounds, as that would "render the other four categories meaningless." Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1197-98 (11th Cir. 2006) ("The risk of persecution alone does not create a particular social group within the meaning of the INA.").

As to the second requirement, a group is "defined with particularity" when it is "discrete," has "definable boundaries," and is not "amorphous, overbroad, diffuse, or subjective." Gonzalez, 820 F.3d at 404 (quotation marks omitted); see also M-E-V-G-, 26 I. & N. Dec. at 239 ("A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group."). And, a group is socially distinct for purposes of the third requirement when society as a whole perceives it as a distinct group. Amezcua-Preciado, 943 F.3d at 1342-43.

Recently, in Amezcua-Preciado, this Court upheld the BIA's determination that the proposed group of "women in Mexico who are unable to leave their domestic relationships" was not a cognizable particular social group. 943 F.3d at 1339-40. Specifically, the Court concluded that: (1) "the immutable characteristic of being women . . . alone is insufficient to make them cognizable as a particular

10

social group" and there was no evidence that Mexican society perceived women who were unable to leave their relationships to be a distinct group; (2) the group was not defined with sufficient particularity because it included all Mexican women in any domestic relationship who are unable to leave for "any reason, including for physical, legal, economic, cultural, or psychological reasons"; and (3) to the extent the Mexican women were unable to leave their domestic relationship "because they fear physical or psychological abuse by their spouse or domestic partner," the group is circularly defined and does not share a "'narrowing characteristic' other than their risk of being persecuted." Id. at 1344-45.

## B.    Matter of A-B-

On appeal, Alvarado argues that the BIA erred in concluding that "Honduran women who are unable to leave a domestic relationship" is not a cognizable particular social group under the INA. As a threshold matter, we first conclude there is no merit to Alvarado's contention that the BIA erred in applying the Attorney General's decision in Matter of A-B- retroactively to her case and instead should have applied Matter of A-R-C-G-, 26 I & N. Dec. 338 (BIA 2014).[4]

---

[4]The government contends we lack jurisdiction to consider any argument concerning the retroactivity of A-B- because Alvarado did not argue this issue before the BIA. See Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1297 (11th Cir. 2015) (providing that this Court lacks jurisdiction to review and consider claims that were not raised before the BIA). However, a review of the record reveals that Alvarado, while not using the word "retroactive," argued in her appeal to the BIA that A-B- did not apply because it was issued after the IJ's decision in this case. This is sufficient for exhaustion purposes, and the retroactivity argument is therefore preserved. See id.; Jeune v. U.S. Att'y Gen., 810 F.3d 792, 800 (11th Cir. 2016).

11

Matter of A-R-C-G- was the BIA's most relevant precedential decision when Alvarado's asylum claim was pending before the IJ. In Matter of A-R-C-G-, the BIA held that the alien's proposed group of "married women in Guatemala who are unable to leave their relationship" was a cognizable particular social group. 26 I & N. Dec. at 388, 392-95. In 2018, however, while Alvarado's BIA appeal was pending, the Attorney General decided Matter of A-B-, which explicitly overruled Matter of A-R-C-G-. 27 I. & N. Dec. at 317.

In Matter of A-B- the alien had proposed a social group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." Id. at 321. The BIA, relying on A-R-C-G-, had concluded her group qualified as a particular social group. Id. The Attorney General directed the BIA to refer Matter of A-B- for his review and used it to address whether, and under what circumstances, being a victim of private criminal activity, such as domestic violence, constitutes a cognizable particular social group. Id. at 317. The Attorney General held that victims of private criminal activity, such as domestic violence, could seek asylum only if, in relevant part, they "establish membership in a particular and socially distinct group that exists independently of the alleged underlying harm." Id. (emphasis added).

In so holding, the Attorney General determined that A-R-C-G- was wrongly decided, and overruled it, because that opinion recognized a new particular social

12

group without correctly applying this and the other standards developed in its prior precedent and instead had merely accepted the Department of Homeland Security's concession that the petitioner was a member of a qualifying particular social group. Id. at 319.  Further, in Matter of A-B-, the Attorney General pointed out that, in A-R-C-G-, the BIA "never considered that 'married women in Guatemala who are unable to leave their relationship' was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm."  Id. at 335.  Yet, "[s]ocial groups defined by their vulnerability to private criminal activity likely lack the particularity required under M-E-V-G-, given that broad swaths of society may be susceptible to victimization."  Id.  Moreover, there was "significant room for doubt that Guatemalan society view[ed] these women . . . as members of a distinct group in society, rather than each as a victim of a particular abuser in highly individualized circumstances."  Id. at 336.  The Attorney General vacated the BIA's opinion relying on A-R-C-G- and remanded the case to the IJ to consider the proposed group using the standards articulated in the Attorney General's opinion.  Id. at 340, 346.

Here, the BIA properly applied A-B- to Alvarado's asylum claim.  In overruling A-R-C-G-, the Attorney General in A-B- explained that the BIA had strayed from its prior precedent setting forth the legal standards for what

13

constitutes a particular social group and clarified that particular social groups cannot be circularly defined by their persecution. See id. at 318-19. The Attorney General's ruling in A-B- "clarified the correct interpretation of the law; it did not change the law." See Yu v. U.S. Att'y Gen., 568 F.3d 1328, 1333 (11th Cir. 2009) (rejecting a similar argument that the BIA erred in retroactively applying an intervening decision of the Attorney General overruling BIA precedent). Once the Attorney General clarified the meaning of the statutory phrase "particular social group" in Matter of A-B-, "that decision became the controlling interpretation of the law and was entitled to full retroactive effect in all cases still open on direct review, regardless of whether the events predated the Attorney General's decision." See id. (stating that the Attorney General's intervening decision "may have dashed [the alien's] hopes of success but it did not impair any vested right").

## C.    Analysis of Alvarado's Proposed Group

Further, given both this Court's and its own precedent, the BIA did not err in concluding in Alvarado's case that "Honduran women who are unable to leave a domestic relationship" is not a cognizable particular social group under the INA. Alvarado's proposed group closely mirrors the proposed group in Amezcua-Preciado of "women in Mexico who are unable to leave their domestic relationship," which this Court held was not cognizable under the INA. See 943 F.3d at 1344-45. It also closely mirrors the proposed group in A-R-C-G- of

14

"married women in Guatemala who are unable to leave their relationship" that the Attorney General determined was not cognizable in A-B- when "properly analyzed." See A-B-, 27 I. & N. Dec. at 335.

Alvarado's proposed group shares several fatal flaws that were found in the aforementioned decisions. First, as Alvarado defines her proposed group, it would include all women in Honduras who are unable to leave any domestic relationship, whether it be for physical, economic, cultural, or psychological reasons. Thus, her proposed group lacks sufficient particularity because its boundaries are "amorphous, overbroad, and subjective." See Amezcua-Preciado, 943 F.3d at 1345.

Second, as the BIA concluded, Alvarado's proposed group is impermissibly circular to the extent it is defined by the underlying harm asserted as persecution in her asylum application. See Perez-Zenteno, 913 F.3d at 1309-10. Alvarado cannot establish the existence of her proposed social group independent of the fact that its members are persecuted. See A-B-, 27 I. & N. Dec. at 334. Accordingly, the BIA did not err in concluding her proposed group is not cognizable under the INA and that she was ineligible for asylum on this ground.

15

## IV.    ASYLUM BASED ON MEMBERSHIP IN PARTICULAR SOCIAL GROUP: "HONDURAN WOMEN WHO ARE VIEWED AS PROPERTY"

Likewise, the BIA and the IJ did not err in concluding that Alvarado's alternatively proposed group of "Honduran women who are viewed as property" also was not cognizable under the INA.  The IJ concluded, and the BIA agreed, that this proposed group lacked particularity.  The BIA explained that, as defined, the group has no "clear benchmark for determining who falls within [it]" and it "could include women of all ages, ethnicities, and social strata, who are in various types of relationships or no relationship at all."  See M-E-V-G-, 26 I. & N. Dec. at 239-40 (requiring a particular social group to be defined by characteristics "that provide a clear benchmark for determining who falls within the group").

Indeed, Alvarado presented evidence from a legal expert on violence against women in Honduras that, because of a culture of machismo in Honduras, all Honduran women (and their children) are perceived as property of their husbands and fathers.  See Perez-Zenteno, 913 F.3d at 1308-09 (rejecting a proposed group of Mexican citizens who are targeted by criminal groups because they have been in the United States and have family in the United States because it "lacked any definable boundaries and actually encompassed a very large percentage of the Mexican population," perhaps numbering in the millions); Amezcua-Preciado, 943

16

F.3d at 1343 (stating that a group that is overbroad or diffuse does not meet the particularity requirement).

Moreover, as the IJ noted, it was unclear who must view the women as property for them to be members of the group. To the extent Alvarado intends "viewed as property" to mean treated as property by her domestic partner and thus mistreated, her definition lacks a "narrowing characteristic" other than the risk of persecution and is impermissibly circular. See Perez-Zenteno, 913 F.3d at 1309-10; A-B-, 27 I. & N. Dec. at 334.

In sum, the IJ and the BIA correctly concluded that Alvarado's proposed group of "Honduran women who are viewed as property" is not cognizable under the INA and thus she is statutorily ineligible for asylum on this ground as well.[5]

## V.  CONCLUSION

For all these reasons, we agree with the BIA that Alvarado did not meet her burden to show she has suffered past persecution or has a well-founded fear of future persecution on account of her membership in a "particular social group." Thus, we deny Alvarado's petition for review.

**PETITION DENIED.**

---

[5]Because Alvarado failed to establish membership in a cognizable particular social group, or otherwise establish her status as a refugee under the INA, her claim to humanitarian asylum is also foreclosed. See Perez-Zenteno, 913 F.3d at 1311 n.3 ("[H]umanitarian asylum does not allow an applicant to receive asylum based on persecution unconnected to any statutorily protected ground. She still must establish she is a refugee, which requires a showing of past persecution on account of a statutorily protected ground.").